746 A.2d 546 (1999)
328 N.J. Super. 611
ALLSTATE INSURANCE COMPANY, Allstate Indemnity Company, Allstate New Jersey Insurance Company, Plaintiffs,
v.
Harry SCHICK, D.C., et al., Defendants.
Tall Pines Chiropractic and Plainfield Injury Center, Inc., Plaintiffs,
v.
Allstate Insurance Company, Defendant.
Accident Recovery Center, et al., Plaintiffs,
v.
Allstate Insurance Company, Defendant.
Superior Court of New Jersey, Law Division, Morris County.[*]
Decided November 23, 1999.
*547 Kenneth E. Pringle, Belmar, for plaintiffs (Pringle & Quinn, attorneys; Mr. Pringle and Daniel S. Hunczak, on the brief).
*548 Harold J. Ruvoldt, Jr., Asbury Park, for defendants Isaac Gross, Metropolitan Diagnostic, P.C., a/k/a Nationwide Diagnostic, P.C., Integrated Comprehensive Medical Services, P.C., National Diagnostic, P.A., Garden State Health, P.C., Gemini Trading Co., Inc., Magnifique and Gottlieb Watchband Corp. (Fischbein, Badillo, Wagner, & Harding, attorneys; Mr. Ruvoldt and Christopher B. Turcotte, on the brief).
VILLANUEVA, J.A.D. (retired and temporarily assigned on recall).
Defendants Isaac Gross, Metropolitan Diagnostic, P.C. a/k/a Nationwide Diagnostic, P.C., Integrated Comprehensive Medical Services, P.C., National Diagnostic, P.A., Garden State Health, P.C., Gemini Trading Co., Inc., Magnifique and Gottlieb Watchband Corp. ("the Gross defendants") move for summary judgment to dismiss the complaint against them which alleges insurance fraud in filing claims for personal injury protection ("PIP") benefits with plaintiffs Allstate Insurance Company, Allstate Indemnity Company and Allstate New Jersey Insurance Company ("Allstate"). Alternatively, the Gross defendants seek a severance.
The issues involved in this motion are: (1) whether Allstate has standing to bring this lawsuit alleging that the defendant medical providers were not legally formed or operated; (2) whether the defendant medical providers are subject to N.J.A.C. 13:35-2.5 which requires a medical practice to be "owned and under the control, supervision and direction of a physician or group of physicians licensed and currently registered in New Jersey"; and (3) whether there is a bona fide dispute as to whether the Gross defendants were legally formed and operated as medical providers or were, as alleged by Allstate, merely a sham to cover up illegal activities.
In a 171-page verified first amended complaint ("complaint") filed on July 29, 1999, plaintiff Allstate alleges that certain defendants have conspired to defraud Allstate, the insurance industry and the ratepayers of New Jersey[1] by creating a complex network of companies with the intent to circumvent the New Jersey statutes and Administrative Code which regulate the providing of health care within this state. Specifically, Allstate contends, inter alia, that: (1) non-provider defendants took assignments of PIP benefits from Allstate claimants in violation of N.J.S.A. 39:6A-4 (the "No Fault Law"); (2) licensed defendants entered into fee-splitting arrangements with non-licensees in violation of N.J.A.C. 13:44E-2.7 and N.J.A.C. 13:35-6.17; (3) defendants created sham medical corporations in violation of both the practice structure regulations of N.J.A.C. 13:35-6.16 and the fee-splitting prohibitions of N.J.A.C. 13:44E-2.7; (4) defendant licensees engaged in self-referrals in violation of N.J.S.A. 45:9-22.5 and N.J.A.C. 13:35-6.17; and (5) defendants' actions as described above were in violation of the New Jersey Insurance Fraud Prevention Act, N.J.S.A. 17:33A-1 to -30 ("the Fraud Act"). Allstate seeks declaratory relief, disgorgement of $14.2 million in PIP benefits paid by Allstate to defendants, but not owed under the No Fault Law, and compensatory and treble damages in excess of $42 million under the Fraud Act.
Allstate sought an order (i) staying all arbitration proceedings currently pending before the American Arbitration Association ("AAA") which were brought against Allstate in order to recover PIP benefits for services allegedly rendered by defendants; (ii) enjoining and restraining the defendant-in-interest, AAA, from accepting for filing any further arbitration demands; and (iii) enjoining and restraining the defendants *549 from seeking to enforce any arbitration awards or judgments previously obtained against Allstate, pending the outcome of this action. This court entered temporary restraints in an order dated August 6, 1999. On October 8, 1999, this court, with the consent of all defendants except the Gross defendants, entered an order containing final restraints.
In its complaint, Allstate alleges that the Gross defendants and others created a group of sham medical corporations that appeared to be owned by plenary licensed physicians as required by applicable administrative regulations. However, these corporations were, in fact, controlled by the Gross defendants through management companies they owned or controlled. One set of sham medical corporations was used to provide diagnostic testing services to the patients of the various Gross-owned facilities. These medical corporations included Metropolitan Diagnostic, P.C. ("Metropolitan"); Garden State Health, P.C. ("Garden State Health"); and Integrity Medical Testing, P.C. ("Integrity").
Defendants Integrity, Executive, Verdi, Cedar Medical and Elm Medical were purportedly owned by defendant Gabriel T. Weinberg, D.O., who resides in Allison Park, Pennsylvania, near Pittsburgh. Defendants Oak Medical, Metropolitan, Garden State Health, Spinal Medical and Prospect Spinal were all purportedly owned by defendant Robban A. Sica, M.D., who resides in Trumbull, Connecticut. Defendants Golden Medical, Prospect Medical and Plainfield Medical were purportedly owned by defendant John Grauerholz, M.D., who resides in Leesburg, Virginia. Dr. Grauerholz also purportedly owns Garden State Health, which was allegedly formed for or by Dr. Samuel Schenker. Dr. Grauerholz's ownership is suspect because Allstate claims his alleged signatures on documents filed with the Secretary of State were forged. That disputed fact alone is sufficient to defeat the motion for summary judgment.
Allstate contends that the purported ownership of these medical corporations by plenary licensed physicians is a sham that is being perpetrated by these defendants to circumvent administrative regulations requiring that diagnostic facilities be owned by plenary licensed physicians and regulations prohibiting plenary licensed physicians from being employed by chiropractors or non-licensees.
Allstate's allegations are based in part upon the recent testimony obtained from J. Scott Neuner, D.C., who is the de facto owner of Northfield Medical Center, P.C. ("Northfield Medical"), for which Dr. Sica had once allegedly posed as the sole shareholder.[2] Dr. Neuner admitted that he has never met Dr. Sica[3], she has never been to Northfield Medical, she invested no money in connection with the creation or operation of Northfield Medical, and had no signature authority over any of its accounts. He also admitted that, at the time of the formation of Northfield Medical, Dr. Sica executed and gave him an undated resignation letter and an undated stock assignment agreement, which she had signed, but left the key elements blank. Dr. Neuner exercised de facto control over Northfield Medical through a service agreement that he signed as both the secretary of Northfield Medical and as president of a management company he owned and had incorporated on the same day Northfield Medical was incorporated.
*550 Allstate contends that these same steps: undated resignation letters, undated stock assignment agreements signed in blank, and service agreements with management companies owned by non-plenary licensed individuals, were followed in connection with the organization of Integrity, Executive, Verdi, Cedar Medical, Elm Medical, Oak Medical, Metropolitan and Garden State Health. Allstate contends that Kamaya Medical Management, Inc.; Bina Medical Management, Inc.; United Management, Inc.; and Gemini Trading Company, Inc. were used by Harry Schick, D.C., Anhuar Bandy and Isaac Gross to exercise dominion and control over these medical corporations.
Allstate's allegations as to the sham ownership of the defendant medical corporations by plenary licensed physicians is supported by other testimony and statements that Allstate has obtained which are contained in three voluminous appendices. For example, Samuel D. Schenker, M.D., who is listed on the records of the Secretary of State as the sole director and shareholder of Metropolitan Diagnostic, P.C., which is purportedly owned by Dr. Sica, testified during a recent examination under oath that his only involvement with Metropolitan was as an independent contractor, who read and interpreted diagnostic testing results. When asked who owned Metropolitan Diagnostic, Dr. Schenker identified Isaac Gross as the owner of Metropolitan.[4] Allstate contends that Metropolitan and many other medical corporations were organized and structured in the same manner.[5]
Allstate's allegations regarding the sham ownership of these medical corporations is also supported by a recent facility inspection that medical investigator David Smith conducted for Allstate at the offices of Prospect Spinal Trauma Center, P.C. Although this corporation was purportedly owned by Dr. Sica, and the records of the Secretary of State list the director of this corporation as George Cicero, D.O., the chiropractor of record at this facility, Peter Leonardis, D.C., stated that he has never heard of Dr. Sica or Dr. Cicero.

I.
The Gross defendants basically argue three points: First, they contend that Allstate lacks standing to challenge the corporate structure of the defendants' enterprises. Second, they argue that even if their corporate structure is defective, the electrodiagnostic testing should nevertheless be compensable under the No Fault Law, because it was performed by a plenary licensed physician and was reasonable and necessary. Finally, they argue *551 that the practice structure of their enterprises, pursuant to which Dr. Sica and Dr. Grauerholz were paid flat fees to pose as the shareholders of Metropolitan and Garden State Health, respectively, while defendant Isaac Gross, a non-licensee, controlled, managed and operated these diagnostic facilities through his jewelry company, Gottlieb Watchband Corp., was proper and lawful.

II.
The Gross defendants' contention that Allstate lacks standing to challenge the corporate structure of Metropolitan Diagnostic and Garden State Health and that they failed to comply with N.J.A.C. 13:35-2.5 ignores the plain wording of the Administration Code and case law. In Allstate Insurance Company v. Orthopedic Evaluations, Inc., 300 N.J.Super. 510, 693 A.2d 500 ("OEI"), certif. granted, 151 N.J. 67, 697 A.2d 541, affirmed on remand, 304 N.J.Super. 278, 700 A.2d 372 (App.Div.1997), the Appellate Division squarely rejected this argument. In OEI, the medical provider sought to overcome Allstate's denial of liability, based on the regulations of the Board of Medical Examiners, contending that a PIP insurer is required to pay for any diagnostic service that meets the statutory test of eligibility, see, e.g., Thermographic Diagnostics, Inc. v. Allstate Insurance Co., 125 N.J. 491, 507-14, 593 A.2d 768 (1991), regardless of whether the services were rendered in accordance with applicable administrative regulations. Instead, the OEI court pronounced that
Where ... the State has elected, under other aegises, to regulate particular procedures or types of procedure by establishing standards governing any aspect of their existence or operation, public policy would be frustrated if non-conforming activities were to prosper through the choices of others, even treating physicians.
[OEI, supra, 300 N.J.Super. at 515-16, 693 A.2d 500.]
The OEI court proceeded to define a medical provider's eligibility to recover PIP benefits under the No Fault Law as follows:
A fair reading of the Act in the light of other provisions of law regulating the qualifications of entities rendering medical services, governed by a commitment to promote consistency of application among provisions relating to associated subjects [citations omitted] requires the conclusion that any healthcare service authorized by the Act, in order to be eligible for recognition, must also comply with any other significant qualifying requirements of law that bear upon rendition of the service. Providers and services included within the ambit of N.J.S.A. 39:6A-2e, which are not regulated in any other way, are governed by a simple application of the "reasonable and necessary" test expounded upon in Thermographic. But, it is only logical that providers and services which are covered by other requirements of law must conform with pertinent norms as a precondition for eligibility under the Act.

[Id. at 516, 593 A.2d 768].
This court has similarly affirmed that an insurer may properly deny PIP benefits under the No Fault Law based upon a healthcare provider's failure to comply with the administrative regulations governing the practice of healthcare in this State. See Prudential Property and Casualty Insurance Company v. Midlantic Motion X-Ray, Inc., 325 N.J.Super. 54, 737 A.2d 711 (Law Div.1999).
In an attempt to avoid an adverse decision on the ultimate issue, the Gross defendants argue in the alternative that even if, as Allstate contends, the "dominion and control" over Metropolitan and Garden State Health was not exercised by Dr. Sica and Dr. Grauerholz, but rather by Isaac Gross and/or other non-licensees in violation of N.J.A.C. 13:35-6.16 and 13:35-2.5, their claims for PIP benefits are nevertheless enforceable because the testing they *552 provided was "reasonable and necessary" and was provided by a plenary licensed physician.
Both the Appellate Division in OEI, and this court in Midlantic Motion X-Ray, have made clear that to be eligible for PIP benefits, diagnostic services rendered by a medical testing or screening facility must, in addition to being "reasonable and necessary"comply with each of the several elements set forth in N.J.A.C. 13:35-2.5(b), which sets forth three distinct primary elements that a medical screening or medical diagnostic testing facility must satisfy. First, the "practice shall be owned and under the responsibility of one or more physicians each of whom holds a plenary license from the State Board of Medical Examiners." Second, the testing "shall be performed under the authority of a designated responsible physician who shall establish a protocol and a quality assurance program for the specific type of screening or study." Third, the results of the test "shall be interpreted by a physician holding a plenary license in this state, and documented in a written report which is preserved by the physician as required by N.J.A.C. 13:35-6.5."
Because Metropolitan and Garden State Health allegedly failed to comply with all three primary elements of N.J.A.C. 13:35-2.5, and the professional practice structure regulations of N.J.A.C. 13:35-6.16, there is at least a bona fide issue that Allstate has no obligation to pay PIP benefits for the services that these entities allegedly rendered, regardless of whether the testing was in fact performed by a plenary licensed physician, or was reasonable and necessary.

III.
It would be difficult to conceive of a network of healthcare and management facilities better designed to facilitate the funneling of PIP benefits into the hands of non-licensees than the complex enterprises devised and operated by the defendants herein, particularly the Gross defendants.[6] Based upon Allstate's investigation to date, one of these arrangements by which the defendants sought to divert or route PIP benefits to the organizers of these enterprises was to create a series of diagnostic facilities by forming medical corporations in which plenary licensed physicians were paid to pose as owners, while the corporations were in fact controlled by non-licensed businessmen who controlled these medical corporations through "management companies" *553 and provided diagnostic services in violation of administrative regulations requiring that such facilities be genuinely owned by plenary licensed physicians.
Pursuant to Allstate's motion to compel the Gross defendants and their lawyers to produce all documents regarding the formation and organization of Metropolitan Diagnostic and Garden State Health, this court entered an order compelling them to produce the executed or unexecuted copies of such agreements or to explain where the originals are. It is astonishing to this court, although it may not be to Allstate, that the certifications of Isaac Gross and the four lawyers who represented him in organizing Metropolitan Diagnostic and Garden State Health do not have in their possession even an unexecuted copy of any agreement entered into with either corporation. Mr. Gross attached a form of a "Physician Employment Agreement between Metropolitan Diagnostic, P.C. and _____________, M.D. Dated: _________, 1997" and the purported "Physician Consulting Contract between Metropolitan Diagnostic, P.C. and Samuel D. Schenker, M.D., Dated 1/28/1997," which he represented were true copies of the agreements that were executed with Dr. Schenker. The problem with that statement is that Metropolitan Diagnostic is not named as a party in the first agreement nor are the blanks completed regarding the term of the agreement and amount of compensation in the second agreement. What is conspicuously missing from Isaac Gross's certification is any attempt to obtain a copy of either agreement from Dr. Schenker or his attorney.
Furthermore, the "signed" copy is suspect because it was purportedly signed by Dr. Schenker, but not by Metropolitan Diagnostic, and it may have been altered because it is apparent that it is not a true copy due to the fact that Dr. Schenker's signature was photocopied many more times than the date next to it which is much clearer. Furthermore, the signatory of the date does not appear to be Dr. Schenker's handwriting, nor was the same pen apparently used. It will be even more suspect if Dr. Schenker is unable to produce fully completed executed originals or copies of these agreements during discovery.
Surely, if Metropolitan or Garden State Health had actually been "owned and under the responsibility of a plenary licensed physician" as required by N.J.A.C. 13:35-2.5(b), then Samuel Schenker, M.D. and Nimfa Aguila, M.D., the two plenary licensed physicians who allegedly performed the testing for these facilities, would have been familiar with Dr. Sica. Indeed, N.J.A.C. 13:35-6.16(f)(3) makes it clear that a plenary licensee may only be employed "within the scope of the practitioner's licensed practice and in circumstances where quality control of the employee's professional practice can be and is lawfully supervised and evaluated by the employing practitioner." [Emphasis added.]
Although both Dr. Schenker and Dr. Aguila have been careful to characterize their respective relationships with Metropolitan as that of independent contractors, N.J.A.C. 13:35-6.16(f)(3) states that "[f]or the purpose of this rule, the term `employment' shall include an ongoing associational relationship between a licensee and professional practitioner(s) or entity on the professional practice premise for the provision of professional services, whether the licensee is denominated as an employee or independent contractor, for any form of remuneration."
Significantly, Dr. Sica could not conceivably have "lawfully supervised and evaluated" Doctors Schenker and Aguila as required by N.J.A.C. 13:35-6.16(f)(3)(i) because she has never met or spoken to either one. In her own affidavit, Dr. Sica has effectively conceded that she had never "lawfully supervised and evaluated" the physicians she purportedly employed, as required by N.J.A.C. 13:35-6.16(f)(3)(i). To the contrary, Dr. Sica's affidavit contains the astonishing admission: "I have *554 always delegated the responsibility for the supervision and quality control for the diagnostic testing performed by Metropolitan Diagnostic, P.C. to the neurologist who physically performs the diagnostic testing on behalf of Metropolitan Diagnostic, P.C."[7]
The uncontradicted testimony of Doctors Sica, Schenker and Aguila is alone dispositive of the Gross defendants' motion for summary judgment. Apparently recognizing this, the defendants are reduced to arguing that Metropolitan and Garden State Health are not "diagnostic testing centers" and are therefore not governed by the regulatory requirements of N.J.A.C. 13:35-2.5. First, this argument is flatly contrary to Metropolitan's own internal documents which recognize that it is governed by N.J.A.C. 13:35-2.5. For example, the Metropolitan Diagnostic Quality Assurance Program specifically states under the section entitled "Compliance" that "Metropolitan will monitor conformance to all appropriate N.J.A.C. codes, State Board of Medical Examiner Regulations, and any other Federal Laws governing the operation of this Diagnostic Screening Facility, e.g. ... N.J.A.C. 13:35-2.5 Medical Standards governing screening and diagnostic medical testing offices." [Emphasis added].
There is no basis for the Gross defendants' suggestion that the outcome in OEI would have been different if the providers' exercise physiology equipment had been transported by automobile and rolled into the physician's office. That is because by its very terms N.J.A.C. 13:35-2.5 applies "irrespective of the stationary or mobile nature of the facility," and the regulation defines a medical testing or screening facility not by where the testing occurs, but by whether the testing is "conducted primarily for persons not receiving medical treatment from the testing entity." See N.J.A.C. 13:35-2.5(b).
In a finding that was quoted at length in OEI and upheld in the Appellate Division's opinion, the trial court found that the purported plenary licensed physician, "who allegedly does something a few times a year with respect to personnel and some quality control ... is not, and can't be considered under any definition of the word ownership, in control of or dominion of being over this company." Id. 300 N.J.Super. at 513, 693 A.2d 500. Inasmuch as there is no evidence in this record herein that Dr. Sica even "does something a few times a year with respect to personnel and quality control," there is at least a substantial question whether Dr. Sica is anything more than a "... shareholder for convenience and in an attempt to comply with the provisions of this code," and therefore Dr. Sica's purported ownership of Metropolitan Diagnostic does not comply with N.J.A.C. 13:35-2.5(b) because she "does not have dominion and control, cannot make decisions for this company and apparently has not made decisions in the past."
Furthermore, Isaac Gross appears to have exercised total responsibility with respect to the finances of Metropolitan and Garden State Health. For example, the Gross defendants' own verified answer admits that it would have violated the management agreement, which they have failed to produce, for Dr. Sica to "access Metropolitan's bank account." Thus, not only is there no evidence in the record that Dr. Sica exercised any "dominion or control" over Metropolitan, there is also no evidence that she maintained any rudimentary financial controls over her purported investment of $10.
Allstate does not contend that providers may not enter into bona fide agreements with management companies. Rather, Allstate contends that non-licensees cannot use management companies to exercise dominion and control over a medical corporation *555 in violation of N.J.A.C. 13:35-2.5(b) or N.J.A.C. 13:35-6.16.
Metropolitan and Garden State Health have also failed to introduce any evidence that they complied with the second element of N.J.A.C. 13:35-2.5(b), which requires that all testing "shall be performed under the authority of a designated responsible physician who shall establish a protocol and a quality assurance program for the specific type of screening or study."
For example, during a several-month period in early 1998, Allstate received bills totalling $192,015.97 from Garden State Health for services rendered on 23 treatment dates. The validity of these claims is questionable because Dr. Aguila has recently submitted a certification in which she not only denies ever having been affiliated with Garden State Health, but even denies ever having heard of Garden State Health. In addition, Dr. Sica even failed to list Garden State Health, P.C. among the 15 New Jersey health care providers for which she claimed to be a shareholder in an October 26, 1998 affidavit she provided to Allstate.
It appears that the reason that Dr. Aguila was not aware that she was performing diagnostic testing for Garden State Health is that the Patient Referral Forms she was given by the referring chiropractor at the time of the testing bore the name of Metropolitan Diagnostic, not Garden State Health. Apparently, it was only after Dr. Aguila forwarded her report and the Patient Referral Forms to Isaac Gross's office that these Patient Referral Forms were altered to substitute the name of Garden State Health for that of Metropolitan Diagnostic at the top of the form. Indeed, a careful examination of these Patient Referral Forms reveals that although the forms refer to Garden State Health, P.C. at the top of the document, they all continue to refer to Metropolitan Diagnostic, P.C. near the bottom of the page in the body of the text.
Moreover, 16 of the 23 treatment dates for which Allstate received bills from Garden State Health occurred before the March 23, 1998 date that Garden State Health, P.C. was incorporated. Therefore, the referral forms signed by the referring chiropractors on these 16 dates could not possibly have referred to Garden State Health, P.C.
There is no competent evidence in the record that Garden State Health, P.C. was owned by Dr. Sica or any other plenary licensed physician. Furthermore, its bills were submitted without the knowledge or consent of the plenary licensed physician whose name was placed on the bills.
Based on these facts, Allstate alleges that most, if not all, of the Patient Referral Forms submitted by Isaac Gross and Gottlieb Watchband Corp. on behalf of Garden State Health were illegally altered to conceal the name of Metropolitan Diagnostic and replace it with that of Garden State Health, P.C. Allstate suspects that these documents were altered and the bills submitted under the name of Garden State Health because Allstate had stopped paying a large number of claims beginning in late 1997, and placed all payments to Metropolitan Diagnostic on hold in early 1998, pending a further investigation. Indeed, as of mid-March 1998, Allstate had more than 100 pending claims from Metropolitan Diagnostic in the amount of approximately of $250,000.

IV.
The Gross defendants contend that the Fraud Act does not apply to their activities because the Fraud Act only relates to making a false written or oral representation in furtherance of a fraudulent insurance claim, and none of the provisions of the Fraud Act pertain to ownership or operator status of a health care provider.
The actions of the Gross defendants in allegedly altering the Patient Referral Forms submitted to Allstate under the name of Garden State Health and Nimfa Aguila when Dr. Aguila had never *556 even heard the name of Garden State Health, and no plenary licensed physician had ever been its bona fide shareholder, clearly would constitute violations of the Fraud Act.
The Fraud Act was clearly intended by the Legislature to apply to more than just the most egregious acts of insurance fraud. For example, contrary to the defendants' interpretation of the Fraud Act as prohibiting only "false written or oral representations", Section 4(a) of the Fraud Act broadly applies to any "statement", which is expressly defined to include a bill or medical record that "contains any false or misleading information concerning any fact or thing material to the claim." N.J.S.A. 17:33A-4(a)(1) and (2). It is also a violation of the Fraud Act if a person "[c]onceals or knowingly fails to disclose the occurrence of an event which affects any person's initial or continued right or entitlement to (a) any insurance benefit or payment...." N.J.S.A. 17:33A-4a(3).
These provisions of the Fraud Act are clearly broad enough to support Allstate's allegations and prohibit the actions of the Gross defendants in submitting bills and medical records to Allstate under the name of Metropolitan Diagnostic, when the defendants knew full well that this facility was in fact under the dominion and control of Isaac Gross, who was allegedly paying Dr. Sica merely to pose as the owner of Metropolitan. If the sole purpose of the management agreement and other arrangements between Gottlieb Watchband Corp. and Metropolitan Diagnostic was to enable the Gross defendants to submit medical records and bills to Allstate and other insurers under the name of a plenary licensed physician and a professional corporation and thereby "mislead" insurers into believing that Metropolitan was in compliance with the requirements of N.J.A.C. 13:35-2.5(b) and 13:35-6.16, and causing them to pay Metropolitan's claims, that clearly would be a violation of the Fraud Act. The same is true with reference to Garden State Health.
The foregoing evidence, as well as the additional information and documents set forth in Allstate's appendices, at least raises factual issues to support Allstate's contention that the alleged ownership of Metropolitan and Garden State Health by plenary licensed physicians is merely a sham designed and intended to circumvent the administrative regulations set forth in N.J.A.C. 13:35-2.5, requiring that diagnostic facilities be owned by plenary licensed physicians, N.J.A.C. 13:35-2.7.
Moreover, because there is serious doubt whether Dr. Weinberg, Dr. Sica and Dr. Grauerholz, all being non residents, did or even could actually exercise any oversight, supervision or control over these defendant medical corporations as required by the regulations of the Board of Medical Examiners, they may have been or are operated illegally. Therefore, the motion for summary judgment to dismiss the complaint against the Gross defendants is denied.

V.
The Gross defendants variously contend that they have been misjoined in this action, or that the claims against them should be severed because they will be prejudiced if they are compelled to go to trial in a case involving staged accidents.
These arguments ignore the alleged connection between Allstate's claims against them and the other defendants. As is apparent from a review of the Fifteenth and Eighteenth Counts of the complaint, Allstate is alleging that the same management agreement arrangement that was used by Isaac Gross and/or others to exercise dominion and control over Metropolitan and Garden State Health was also used by Dr. Schick and others to exercise dominion and control over other defendants. Moreover, Allstate alleges that Dr. Sica was also the purported owner of Prospect Spinal Trauma Center, P.C. and Spinal *557 Care Medical Center, P.C.[8] Finally, although the Gross defendants insist that there is no connection between them and Dr. Schick or Anhuar Bandy, there are certainly a great number of "coincidences." For example, the overwhelming majority of patients treated by Metropolitan and Garden State Health were referred by chiropractors at Bandy-owned facilities. In addition, the North Carolina billing person used by Metropolitan and Garden State Health also performs billing for facilities owned by Dr. Schick. Furthermore, Metropolitan Diagnostic entered into a factoring agreement with the same company with which Executive Medical Testing, P.C. (which Allstate alleges was controlled by Dr. Schick) entered into a factoring relationship. Finally, the attorney who caused the incorporation of Metropolitan Diagnostic, P.C., and served as its registered agent, was Howard Z. Buckner, Esquire, who incorporated other defendant chiropractic facilities for Anhuar Bandy, and who the Gross defendants inexplicably fail to mention in the Fifth Affirmative Defense in their verified answer when they identify the attorneys who were involved in the incorporation of Metropolitan Diagnostic.
Under these circumstances, it would be inefficient and inappropriate at this time to sever Allstate's claims against the Gross defendants from those involving the other defendants before discovery has even begun, particularly inasmuch as the court can always sever Allstate's claims against these defendants after discovery, but before the trial begins. Therefore, the Gross defendants' motion to sever is denied without prejudice.
NOTES
[*] Consolidated with Superior Court of New Jersey, Chancery Division, Middlesex County, Docket No. MID-C-151-99.
[1] On July 13, 1999, agents from New Jersey's Office of Insurance Fraud Prosecutor ("OIFP") raided the facilities of six of the defendant chiropractic and rehabilitation facilities named as defendants herein. Agents of the OIFP and F.B.I. also arrested several individuals alleging that they were part of a fraud ring conspiring to defraud the insurance industry.
[2] Northfield Medical, along with Oak Medical, Metropolitan Diagnostic, Garden State Health and Prospect Spinal are among at least two dozen medical corporations in New Jersey and New York to which Dr. Sica allegedly has "leased" her medical license in exchange for periodic payments. Dr. Sica provided Allstate with an October 26, 1998 affidavit in which she claimed to own at that time in whole or in part fifteen medical corporations, including Metropolitan Diagnostic.
[3] Dr. Neuner admitted that he was introduced over the telephone to Dr. Sica by Daniel H. Dahan, who owns Practice Perfect, a California consulting company that specializes in assisting chiropractors in setting up such arrangements.
[4] Because Garden State Health utilizes the same billing post office box and the same forms as Metropolitan, Allstate contends that Garden State Health is in fact owned by Gross, Dr. Schick and/or Anhuar Bandy, and not by Dr. Sica or any other plenary licensed physician.
[5] The corporations were incorporated by Robert P. Borsody, Esquire, who allegedly recruited them to pose as shareholders. Borsody is a New York attorney, not admitted in New Jersey, who considers himself to be an expert on "health care delivery systems." He is closely affiliated with Practice Perfect, Inc., a California-based consulting company owned by Daniel H. Dahan, which promotes the formation by chiropractors of "MD/DC/PT Rehab Centers." Borsody is a regular speaker at sales seminars held by Practice Perfect throughout the country. As part of their service to their chiropractor clients, Practice Perfect and Dahan arrange to hire a medical doctor to pose as the shareholder of the medical corporation, which is controlled by a "management company" owned by the chiropractor. Practice Perfect maintains a website at www.dahan.com for which Borsody has written a legal article, which can be accessed by pressing the button entitled, "Legal Standpoint" on the page entitled, "About MD/DC/PT Practice," which can be accessed from the main page. The website also contains a slide presentation, which can be accessed from the "Seminar Information" page by clicking the flickering movie projector icon at the bottom of that page. The 17th slide in this presentation contains a heading at the top, which states: "MD Owner Assigned." At the bottom, the slide reads: "Practice Perfect will locate, hire and negotiate with your MD Owner."
[6] In their brief, the Gross defendants allege that on January 28, 1997, Metropolitan Diagnostic, P.C. filed a Certificate of Incorporation with the State of New Jersey to provide diagnostic testing. Samuel D. Schenker, M.D. was named as its sole director at that time. Shortly thereafter, Dr. Schenker resigned as director and Robban A. Sica, M.D. assumed the role. Metropolitan performed only neurological testing on a referral basis, with each physician acting on behalf of Metropolitan traveling to the referring doctor's office to conduct the tests. Contemporaneous with its incorporation, Metropolitan retained Gottlieb Watchband Corporation, a New York corporation, to serve as its management company. Magnifique and Gemini Trading Co., Inc. were long-time "d/b/a"s of Gottlieb. At the time that Gottlieb commenced its management relationship with Metropolitan, Gross was sole owner and president of Gottlieb.

On November 21, 1997, Dr. Sica filed a Certificate of Registration of Corporate Alternate Name, naming National Diagnostic, P.A. as d/b/a of Metropolitan. On March 23, 1998, Garden State Health, P.C. filed a Certificate of Incorporation with the State of New Jersey to provide diagnostic testing. Gottlieb also acted as Garden State's management company. Like Metropolitan, Garden State performed only neurological testing on a referral basis, with each physician acting on behalf of Garden State traveling to the referring doctor's office to conduct the tests.
On April 9, 1998, Dr. Sica filed a Certificate of Registration of Corporate Alternate Name, naming Integrated Comprehensive Medical Services, P.C. as a d/b/a of Metropolitan. Additionally, on that same day, a Certificate of Registration of Corporate Alternate Name was filed on behalf of National Diagnostic, P.A. as a d/b/a of Garden State Health, P.C. On April 14, 1998, Dr. Sica filed a Certificate of Registration of Corporate Alternate Name, naming Nationwide Diagnostic, P.C. as d/b/a of Metropolitan.
[7] Dr. Aguila's assertion is troubling inasmuch as most, if not all, of the HCFA forms submitted to Allstate by Garden State Health identified Nimfa Aguila, M.D. as the testing physician.
[8] The Gross defendants' admission in their Fifth Affirmative Defense that Robert Borsody, Esquire was involved in the management agreement between Metropolitan Diagnostic and Gottlieb Watchband Corp. provides an additional link to the facilities purportedly owned by Dr. Grauerholz and Dr. Weinberg.