SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**Allstate Insurance Company v. Northfield Medical Center, P.C. (A-27-15) (076069)**

**Argued January 4, 2017 -- Decided May 4, 2017**

**LaVecchia, J., writing for a unanimous Court.**

In this appeal, the Court reviews the Appellate Division's determination that the trial court erred in finding a knowing violation of the Insurance Fraud Prevention Act (IFPA), N.J.S.A. 17:33A-1 to -30. After a bench trial, Robert P. Borsody, Esq., a New York attorney, and Daniel H. Dahan, a California chiropractor, were found to have violated the IFPA to the extent they promoted and assisted in the creation of a practice structure designed to circumvent regulatory requirements with respect to the control, ownership, and direction of a medical practice.

N.J.A.C. 13:35-6.16(f), codified in 1992, explicitly provides that a medical doctor with a plenary scope of practice may not be employed by a licensee with a more limited scope of practice, such as a chiropractor. In 1995, the Executive Director of the State Board of Medical Examiners (Board), issued a letter-opinion in response to a hypothetical scenario in which a professional association was divided between a chiropractor holding a seventy-percent interest and a doctor holding a thirty-percent interest. The director wrote that "[The Board] would find it inappropriate for a physician with a plenary scope of practice (M.D./D.O.) to be in a position where the practitioner with a limited scope of practice (here, a [chiropractor]) can compel—by the simple fact of majority voting rights—the medical doctor to accept contracts for the provision of all manner of services."

In the 1990s, Dahan began organizing a series of lectures throughout the country through his company, "Practice Perfect." Practice Perfect lectures were marketed toward chiropractors and focused on the creation of multi-disciplinary practices in which chiropractors work with physicians and other medical professionals. Borsody made presentations at Practice Perfect lectures on the legal issues arising from such multi-disciplinary practices.

In late 1996, New Jersey-licensed chiropractor John Scott Neuner attended a two-day Practice Perfect seminar at which both Dahan and Borsody presented. The practice model, developed by Borsody and pitched at Dahan's programs, included a number of safeguards to prevent the nominal doctor-owner of the medical corporation from seizing control of the practice from the real investor—the chiropractor. Prior to the seminar attended by Neuner, Borsody wrote at least one trade article that correctly stated that New Jersey requires a majority of the ownership interest in a medical corporation to be owned by medical doctors.

In March 1997, after attending the Practice Perfect seminar described above, Neuner signed a contract with Dahan to become a client of Practice Perfect. Neuner hired Dr. Robban A. Sica, M.D., as the initial doctor-owner of Northfield. Neuner also hired several doctors to work at Northfield who held no ownership interest in the practice.

In late 1998, Allstate, which had been receiving insurance claims for treatment provided at Northfield, began investigating the legality of Northfield's practice structure. Neuner retained Borsody to represent him and, in January 1999, Borsody wrote that because the doctors hired to work at Northfield did not own stock in the medical practice, Neuner's employment of those doctors likely violated existing guidance from the Board. As a result of its investigation, Allstate refused payment on approximately $330,000 in claims of patients treated by Northfield.

Allstate filed the instant action on October 19, 1999, against Neuner, Northfield, Dahan, Borsody, and a number of additional defendants. Neuner settled with Allstate early in the proceedings, in part in exchange for his agreement to testify against his co-defendants. For present purposes, the salient charges of the complaint allege that Borsody and Dahan (collectively, defendants) violated the IFPA by knowingly assisting Neuner in the creation and operation of a multi-disciplinary practice whose insurance claims were fraudulent under the IFPA. Allstate's theory of the case relies on the practice's failure to comply with governing standards on the corporate practice of medicine, a necessary precondition to a valid insurance claim.

The trial court found that Borsody and Dahan violated the IFPA when they "knowingly assisted, conspired with and urged Neuner to operate in a fashion that violated the law." In an unpublished opinion, the Appellate

Division reversed, concluding that the evidence did not support a finding that defendants knowingly violated the IFPA. The Court granted Allstate's petition for certification. 223 N.J. 555 (2015).

**HELD**: Defendants extensively promoted a professional practice structure that a fact-finder could reasonably conclude was little more than a sham intended to evade well-established prohibitions and restrictions governing ownership and control of a medical practice by a non-doctor. In light of the broad anti-fraud liability imposed under the IFPA, holding defendants responsible for promoting and assisting in the formation of an ineligible medical practice was not a novel or unanticipated application of the statute. The trial court correctly applied a plain-language understanding of "knowing," and its finding of a knowing violation of the IFPA is amply supported in this record.

1. N.J.S.A. 17:33A-4(b) instructs that "[a] person or practitioner violates [the IFPA] if he knowingly assists, conspires with, or urges any person or practitioner to violate any of the provisions of this act." Defendants were found to have knowingly assisted or conspired with Neuner in violating the IFPA by promoting and helping Neuner with the construction of an impermissible professional practice structure that enabled the chiropractor to benefit from proceeds derived from his submission of medical claims for reimbursement, in violation of N.J.S.A. 17:33A-4(a), (c). Proof of such violation need only be found to exist based on a preponderance of the evidence. (pp. 24-26)

2. This is not a criminal case. The trial court rightly did not import aspects of a "knowing" mens rea from the Criminal Code into the civil liability section of the IFPA at issue. Rather, the court correctly applied a plain-language understanding of "knowing," which is well understood to be an awareness or knowledge of the illegality of one's act. That knowledge need not come from a prior decision holding that the precise conduct at issue gives rise to a violation of a legal requirement. There is ample precedent supporting the proposition that a party's knowledge as to the falsity or illegality of his conduct may be inferred from the surrounding factual circumstances. (pp. 26-35)

3. Defendants claim that they could not have knowingly violated the IFPA because it was not clear that compliance with practice-structure regulations was "material" to insurance submissions. The Court does not accept that a reasonable actor would not have known that compliance with the regulatory provisions governing the organization, supervision, and control of a medical practice was material to an insurance submission by that medical practice. Health care services are highly regulated. One cannot claim, or feign, ignorance of those regulatory requirements and restrictions until there is an express command applicable to a precise set of facts. (pp. 35-38)

4. The Court reviews the regulatory requirements in place governing the lawful structures for medical practices when Borsody and Dahan promoted their practice model and notes that the 1995 letter makes plain that the Board would allow no subterfuge to shield the existence of a real or potential corrupting influence that could be exercised by a management company or by a professional association where a licensee with a lesser scope of practice, like a chiropractor, could actually wield control over the practice of medicine by a plenary licensee. (pp. 38-40)

5. Based on the regulations in effect at the time and the testimony at trial, the trial court here could reasonably conclude that Borsody, as well as Dahan, knew of the regulatory requirements at issue, promoted a practice scheme specifically designed to circumvent those requirements while appearing compliant, and therefore knowingly assisted in the provision of services, the foreseeable result of which was the submission of invalid and misleading claims under the IFPA. The documents and structure promoted and designed by defendants accomplished what the regulations sought to avoid. They placed control over the medical practice in the hands of a chiropractor, subjecting plenary licensees to his effective control. The lengths that defendants went to in shielding the true controller of this practice from view undermine any basis for interfering with the trial court's assessment of the mixed question of fact and law that was presented to the court. (pp. 40-44)

The judgment of the Appellate Division is **REVERSED**. The case is **REMANDED** to the Appellate Division for proceedings consistent with this opinion.

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE LaVECCHIA's opinion. JUSTICE ALBIN did not participate.**

ALLSTATE INSURANCE COMPANY,
ALLSTATE INDEMNITY COMPANY,
ALLSTATE NEW JERSEY INSURANCE
COMPANY,

    Plaintiffs-Appellants,

        v.

NORTHFIELD MEDICAL CENTER,
P.C.; ROBBAN ARIEL SICA, M.D.;
SCOTT DAVID, D.O.; J. SCOTT
NEUNER, D.C.; JSM MANAGEMENT
COMPANY, INC.; TILTON
CHIROPRACTIC CENTER, P.C.;
TILTON CHIROPRACTIC CENTERS,
SOUTH DIVISION, P.C.; ARNOLD
BACARRO, M.D.; PANKAJ ANAND
AGRAWAL, M.D. a/k/a "PANKAJ
ANAND"; ALAN CARR, D.O.;
VORRIE MACOM, M.D.; ALONSO V.
CORREA, M.D.; ALONSO V.
CORREA, M.D., P.C.; CORREA
MEDICAL DIAGNOSTICS, P.C.;
MEDICAL INNOVATIONS, INC.,

    Defendants,

        and

DANIEL H. DAHAN, D.C.; PRACTICE
PERFECT; MEDICAL NEUROLOGICAL
DIAGNOSTICS, INC.,

    Defendants-Respondents,

        and

ROBERT P. BORSODY, ESQ.,

    Defendant-Respondent,

        and

1

AMERICAN ARBITRATION
ASSOCIATION,

Defendant in Interest.

Argued January 4, 2017 – Decided May 4, 2017

On certification to the Superior Court,
Appellate Division.

Thomas J. Hall argued the cause for
appellants (McGill & Hall and Pashman Stein,
attorneys; Mr. Hall and Michael S. Stein, on
the briefs).

Lawrence S. Lustberg argued the cause for
respondent Robert P. Borsody, Esq. (Gibbons,
attorneys; Mr. Lustberg and Amanda B.
Protess, on the briefs).

Christopher B. Turcotte argued the cause for
respondents Daniel H. Dahan, D.C., Practice
Perfect and Medical Neurological
Diagnostics, Inc.

John Zen Jackson argued the cause for amici
curiae Medical Society of New Jersey and the
American Medical Association (McElroy,
Deutsch, Mulvaney & Carpenter, attorneys).

Arthur Meisel submitted a brief on behalf of
amicus curiae New Jersey Dental Association.

JUSTICE LaVECCHIA delivered the opinion of the Court.

Plaintiff Allstate Insurance Company (Allstate) filed a

complaint alleging statutory claims of insurance fraud against

defendants Robert P. Borsody, Esq., a New York attorney, and

Daniel H. Dahan, a California chiropractor (collectively,

defendants).  After a bench trial, defendants were found to have

violated the Insurance Fraud Prevention Act (IFPA), N.J.S.A.

2

17:33A-1 to -30, by assisting a New Jersey chiropractor in the late 1990s in the creation of an unlawful multi-disciplinary practice, which submitted medical insurance claims to Allstate. The trial court determined that Borsody and Dahan violated the IFPA to the extent they promoted and assisted in the creation of a practice structure that was designed to circumvent regulatory requirements with respect to the control, ownership, and direction of a medical practice.

The Appellate Division reversed that judgment. In doing so, the panel relied on defendants' arguments that Allstate had not established that defendants actually knew that their practice model violated regulatory requirements governing the lawful ownership and control of a medical practice, and that, even if evidence of such knowledge could be found in this record, Allstate had not established that defendants knew that a violation of those regulatory requirements could constitute insurance fraud under the provision of the IFPA that creates liability for one who "knowingly assists, conspires with, or urges any person or practitioner to violate any of the provisions of [the IFPA]." N.J.S.A. 17:33A-4(b). The Appellate Division concluded that the trial court erred in finding a knowing IFPA violation on the facts presented.

Allstate sought our review of that determination, and we now reverse.

3

Defendants extensively promoted a professional practice structure that a fact-finder could reasonably conclude was little more than a sham intended to evade well-established prohibitions and restrictions governing ownership and control of a medical practice by a non-doctor. Further, in light of the broad anti-fraud liability imposed under the IFPA, holding defendants responsible for promoting and assisting in the formation of an ineligible medical practice -- created for the obvious purpose of seeking reimbursement for medical care delivered by that practice -- was not a novel or unanticipated application of the statute. We conclude that the trial court's finding of a knowing violation of the IFPA is amply supported in this record, which contains compelling evidence demonstrating how the structure shielded from view its effective circumvention of regulatory rules.

For the reasons that follow, we reverse on the sole issue found to be determinative by the Appellate Division. Because there were other issues not reached by the panel, we remand to the Appellate Division to allow for their evaluation.

I.

Fair consideration of this matter necessitates, first and foremost, an understanding of the rules and requirements for ownership, control, and direction of a physician's practice.

Accordingly, before addressing the facts, we identify the requirements in place at the time relevant to this appeal.

A.

The State Board of Medical Examiners (Board) -- the entity responsible for establishing standards for professional practice by licensed physicians -- has addressed the permissible types of professional practice forms. A regulation, adopted by the Board in 1992 and codified at N.J.A.C. 13:35-6.16, figures prominently in this matter.

With the codification of N.J.A.C. 13:35-6.16, the Board established limits on the corporate practice of medicine. Section 6.16(f) lists the appropriate types of private practices -- for example, solo practice, partnership, and medical corporation -- and explicitly provides that a medical doctor with a plenary scope of practice may not be employed by a licensee with a more limited scope of practice, such as a chiropractor. In directing the proper structure of a medical practice, the regulation provides that

> [a] practitioner may practice solo and/or may employ or otherwise remunerate other licensed practitioners to render professional services within the scope of practice of each employee's license, but which scope shall not exceed that of the employer's license. The practitioner may employ ancillary non-licensed staff in accordance with Board rules, if any, and accepted standards of practice.
>
> [N.J.A.C. 13:35-6.16(f)(1).]

5

Subsection (f)(2) directs that

> [a] practitioner may practice in a partnership, professional association, or limited liability company, but such entity shall be composed solely of health care professionals, each of whom is duly licensed or otherwise authorized to render the same or closely allied professional service within this State.
>
> [N.J.A.C. 13:35-6.16(f)(2).]

Next, subsection (f)(3) defines employment as "an ongoing associational relationship between a licensee and professional practitioner(s) or entity on the professional practice premises for the provision of professional services, whether the licensee is denominated as an employee or independent contractor, for any form of remuneration." N.J.A.C. 13:35-6.16(f)(3). Thereafter, subsection f(3)(i) provides that

> [a] practitioner may be employed, as so defined, within the scope of the practitioner's licensed practice and in circumstances where quality control of the employee's professional practice can be and is lawfully supervised and evaluated by the employing practitioner. Thus, a practitioner with a plenary license shall not be employed by a practitioner with a limited scope of license, nor shall a practitioner with a limited license be employed by a practitioner with a more limited form of limited license. By way of example, a physician with a plenary license may be employed by another plenary licensed physician, but an M.D. or D.O. may not be employed by a podiatrist (D.P.M.) or chiropractor (D.C.) or midwife or certified nurse midwife (R.M., C.N.M.). A podiatrist may not employ a chiropractor. This section shall not preclude any licensee from employing licensed personnel such as nurses, x-ray

6

technologists, physical therapists, ophthalmic dispensers and ophthalmic technicians, etc., as appropriate to the primary practice of the employer.

[N.J.A.C. 13:35-6.16(f)(3)(i).]

In addition to the above-mentioned parts of section 6.16, N.J.A.C. 13:35-6.17 bears noting, specifically subsections (h) and (i), which permit administrative contracts between a management company and a professional practice. The permissibility of a medical practice's use of a management company was also addressed, to an extent, in a 1983 Appellate Division decision.

In Women's Medical Center v. Finley, the Appellate Division considered whether three obstetrics and gynecological practices that were performing on-site abortions were subject to the Health Care Facilities Planning Act, N.J.S.A. 26:2H-1 to -26, or instead were exempt as a "private practice," a term not defined under that Act. 192 N.J. Super. 44 (App. Div. 1983), certif. denied, 96 N.J. 279 (1984). The Appellate Division held that medical practices contracting with outside management companies "for the provision of a full range of non-professional office management services" were properly considered private medical practices under New Jersey regulatory law. Id. at 48. Anticipating the importance of physician control over the practice, the panel reasoned that

7

> [i]f the manner of [the services'] performance does not impinge upon the ordinary patient-private physician relationship and does not impinge upon professional control by the physicians of the medical practice and does not affect the essential character and commonly understood attributes of private practice, then it is evident that the "in-house" versus "out-of-house" business and administrative management of the practice has no fundamental impact on the . . . delivery of health care services.

[Id. at 58.]

### B.

In addition to the administrative regulations governing the subject of ownership and control of a physician's medical practice, there are also other forms of guidance issued for the benefit of members of the public and regulated entities. Consistent with its administrative responsibility for licensure and oversight of the practice of medicine, the Board has on several occasions issued informal guidance in response to inquiries on the propriety of particular practice arrangements. The following informal opinions bear on the dispute at hand.

On November 16, 1995, the Board's Executive Director, Kevin B. Earle, issued an extensive letter-opinion in response to a hypothetical scenario in which a professional association was divided between a chiropractor holding a seventy-percent interest and a doctor holding a thirty-percent interest. It is the most comprehensive letter-opinion issued on the subjects involved in this appeal. In that letter-opinion (hereinafter

8

"Earle I"), the director noted that the Board had not "had occasion to consider a specific shareholder arrangement involving unequal ownership within a practice." However, Director Earle wrote that, in the context suggested by the inquiry, the Board "would find that division especially questionable and inappropriate." Because of its importance, we quote the explanation in full:

> [The Board] would find it inappropriate for a physician with a plenary scope of practice (M.D./D.O.) to be in a position where the practitioner with a limited scope of practice (here, a [chiropractor]) can compel -- by the simple fact of majority voting rights -- the medical doctor to accept contracts for the provision of all manner of services to the Professional Association. The potential for override of the physician's professional judgment, as well as the determination as to how the practice shall be conducted, is deemed to be even more inappropriate where the management company itself is wholly owned by the 70% shareholder of the Professional Association who is a limited licensee.
>
> Further, your scenario appears to contemplate that other physicians shall be hired by the Professional Association. Current Board [R]ule N.J.A.C. 13:35-6.16(f)(3)(i) specifically prohibits the hiring of a plenary licensed physician by a limited licensed practitioner. While we recognize that it is nominally the Professional Association which is the "employer" rather than the chiropractor, for our purposes that would be a distinction without a difference. For that quality control reason, the Board has always held that a multi-disciplinary practice cannot employ physicians who are not themselves shareholders in the practice.

9

> You have also indicated that the other licensed professionals who would be employed by this Professional Association would not necessarily be under the supervision of the medical doctor/Medical Director. We find this to be inappropriate. Employees of any form of professional practice, whether independently licensed or not, are expected to remain under the general supervision of the employer, including a Medical Director, if any. See Board [R]ule N.J.A.C. 13:35-6.16(b), (d) and (e).

Earle I also touches on administrative contracts between the proposed practice and management company, noting that, although "N.J.A.C. 13:35-6.17(h) and (i) specifically permit[]" administrative contracts between a management company and a professional practice, the Board nevertheless "expects that a licensee shall retain the right to terminate any such contract for legally permissible reasons including for cause." Summarizing the advice on such arrangements, Earle I states that the Board would find it "highly imprudent for a physician (through the Professional Association) to enter into a contract with the same management company which also leases space and equipment and provides administrative services" because (1) "the physician would be subject to coercive influences including foreseeable total disruption of an ongoing professional practice if the physician later sought to cease using the management company to provide any of those individual services"; and (2) "termination might well be impossible because of the 70% ownership in the Professional Association of the person who also

10

owns the management company." The Earle I advisory letter underscored the need to neuter any coercive influences by cautioning that, at a minimum, "each such contract should be separate and without any interlocking features."

Finally, the Earle I letter addressed a proposal to allow the management company to make above-market-rate loans to the practice, calling that proposal particularly concerning to the Board because it created "a clear potential to adversely affect the professional judgment of the minority shareholder in numerous ways." The Earle I document added that designating the minority shareholder physician as the Medical Director "cannot save the scenario from the potential abuse and coercion inherent in the various circumstances described."

A few weeks before the incorporation of the disputed practice at issue here, Director Earle issued a second advisory letter (hereinafter "Earle II") on April 28, 1997, confirming the opinion-seeker's interpretation "that a medical doctor and a chiropractor [may] form a professional corporation and both may own shares in such a corporation," but that the medical doctor, as the licensee with a plenary scope of practice, must own a majority of the stock in the corporation.

After the incorporation of the practice involved in this appeal, another advisory letter touching on the topic at hand was written on June 11, 1997, by a Deputy Attorney General in

11

her capacity as a counsel to the Board.  That letter stated that a chiropractor and a medical doctor may join their practices in a professional corporation, but that "it is important to note that the licensees must maintain professional discretion of their judgment in the rendering of professional services."  The letter also noted that "[t]here is no statutory or regulatory provision requiring that the licensee with the greater scope of practice hold a majority of the stock in the professional corporation."

With that state regulatory background in mind, we turn to the record in this matter.

## II.

### A.

Defendants' appeal comes to us on the basis of a completed bench trial.  The backdrop to this matter involves actions taken by a New Jersey-licensed chiropractor, John Scott Neuner. Neuner testified in the trial of the IFPA complaint filed by Allstate against the multi-disciplinary practice that he had incorporated as Northfield Medical Center (Northfield), as well as the various other professional entities and persons named as defendants.  To set the stage for the issue determined to be dispositive by the Appellate Division, we begin by summarizing how Neuner and the two defendants came into contact with one another, leading to the incorporation of Northfield and how it

12

was structured and operated.  We recite the facts giving due respect to the trial court's findings of fact, which incorporated credibility determinations.

1.

In the 1990s, Dahan, a chiropractor licensed in California, began organizing a series of lectures throughout the country through his company, "Practice Perfect."  Practice Perfect lectures were marketed toward chiropractors and focused on the creation of multi-disciplinary practices in which chiropractors work with physicians and other medical professionals.  Borsody, a New York-based healthcare attorney, made presentations at Practice Perfect lectures on the legal issues arising from such multi-disciplinary practices.

In late 1996, Neuner attended a two-day Practice Perfect seminar at which both Dahan and Borsody presented.  According to Neuner, Borsody explained that a chiropractor may not own a majority interest in a medical practice, may not split fees with a doctor, and must refrain from self-referrals and kickbacks.  Borsody proposed a model form of practice that he had developed for a multi-disciplinary center, which allowed an investing chiropractor to retain control of the finances of a medical practice.  Borsody's practice model relied on a series of contracts between a management company owned by the investing chiropractor and a separate medical corporation owned by a

13

doctor. The stated goal of the interconnected contracts was to protect the chiropractor's financial investment in the medical practice.

Borsody's model included three key types of contracts: (1) space rental leases, (2) equipment leases, and (3) management contracts. The overarching purpose of each of those contracts was to allow the chiropractor-owned management company to extract profits from and maintain control over the affiliated medical corporation. Borsody explained that a majority of the stock in the medical corporation should be owned by a medical doctor, but he clarified that this doctor need not participate in the day-to-day treatment of patients. Separately, other doctors would be employed by the medical corporation to see and treat patients. All profits from the endeavor would be paid to the management company, which would be owned by the chiropractor, in exchange for the provision of management services, leased space, and leased equipment.

The practice model, developed by Borsody and pitched at Dahan's programs, included a number of safeguards to ensure continued control of the practice by the chiropractor-manager. First, the doctor designated as the owner of the medical corporation would be asked to sign an undated resignation letter. Second, the doctor would be asked to sign an undated "AFFIDAVIT OF NON ISSUED OR LOST CERTIFICATE," bearing an

14

unexecuted notary attestation for the doctor's signature and the date. Through those two documents, the chiropractor could, if necessary, remove the doctor from his or her position and have it appear that the controlling interest in stock certificates previously held by the doctor was being transferred from the departing physician to another physician.[1] Third, Borsody told lecture participants that the leases between the management company and the medical corporation should include a "break fee" of $100,000 to penalize the medical practice's doctor-owner for breaking the lease. That combination of measures was intended to prevent the nominal doctor-owner of the medical corporation from seizing control of the practice from the real investor -- the chiropractor.

In addition to hearing Neuner's description of the information conveyed at the lecture on how the practice structure was designed to operate and hearing a tape from another Practice Perfect seminar -- described by Neuner as "substantially" the same in its content -- the trial court also admitted into the record a descriptive article authored by Borsody. Specifically, prior to the seminar attended by Neuner, Borsody wrote at least one trade article discussing the law of

---

[1] That "AFFIDAVIT OF NON ISSUED OR LOST CERTIFICATE" enabled the chiropractor to maintain control and never be forced to trust the removed doctor to actually transfer to another doctor stock that either was never issued or purportedly was lost.

multi-disciplinary practices, including the legal requirements for ownership.  That article, which the trial court had before it, correctly stated that New Jersey requires a majority of the ownership interest in a medical corporation to be owned by medical doctors.  Borsody stated in the article that this rule is in place because non-doctor ownership "would risk interference with clinical decisions of [doctors] employed in those practices."  Addressing the contractual relationships between practices and outside management companies, Borsody wrote that courts have "smile[d] upon contracts which make clearly nonprofessional services available on an arms-length basis" and "[f]rowned upon . . . contracts that show excessive control over the corporate activities of the [practice] (e.g., the right to replace the shareholder); that show control over hiring, firing and disciplining of employed [doctors]; and that have excessive control over financial affairs of the [practice]."  Borsody's article warned that concentration of nonprofessional services in a management company, and inclusion of those "frowned upon" contractual provisions, would be "fraught with peril."

2.

On March 28, 1997, after attending the Practice Perfect seminar described above, Neuner signed a contract with Dahan to become a client of Practice Perfect.  Neuner spoke with Borsody

16

about establishing a medical corporation and management company as had been described. He learned that Borsody's fee to set up a multi-disciplinary practice would be about $9000. When Neuner relayed that fee information to Dahan, the latter called the fee "outrageous" and provided Neuner with a phone number that he could call to obtain form documents for the creation of the necessary entities. Neuner ultimately paid $2600 for those form documents. Unbeknownst to Neuner, the source of those documents was a separate firm owned by Dahan that was reproducing and distributing contracts previously drafted by Borsody, without Borsody's knowledge or permission. Neuner used the forms to incorporate JSM Management, a management company, and Northfield, a medical corporation. Neuner also consulted a New Jersey attorney but was advised by Dahan that it was not necessary to "reinvent the wheel" by having an attorney redraft legal documents already included in the forms provided by Dahan's consulting firm.

Neuner hired Dr. Robban A. Sica, M.D., as the initial doctor-owner of Northfield. Neuner had never met Dr. Sica before Dahan referred Neuner to her. Neuner also hired several doctors to work at Northfield. Those doctors held no ownership interest in the practice. In April 1998, due to a disagreement between Dr. Sica and Neuner, Neuner replaced her with a new doctor-owner. According to the new owner, Dr. Scott David,

17

D.O., he was told that he "could be like a hired CEO, [or] like a figure head on a board, and [he] would get compensation for that with limited time." Dr. David also testified that Borsody told him that he did not need malpractice insurance because he would not be treating patients at Northfield.

In late 1998, Allstate, which had been receiving insurance claims for treatment provided at Northfield, began investigating the legality of Northfield's practice structure and ceased paying claims to the practice. Neuner retained Borsody to represent him with respect to the investigation. On January 28, 1999, Borsody wrote to Neuner, informing him that because the doctors hired to work at Northfield did not own stock in the medical practice, Neuner's employment of those doctors likely violated existing guidance from the Board.

As a result of its investigation, Allstate refused payment on approximately $330,000 in claims of patients treated by Northfield.

B.

1.

Allstate filed the instant action on October 19, 1999, against Neuner, Northfield, JSM Management, Dahan, Borsody, and a number of additional defendants. The matter has a tortuous procedural history, and not all of its details are relevant to the issue in this appeal. However, we note that Neuner settled

18

with Allstate early in the proceedings, in part in exchange for his agreement to testify against his co-defendants. For present purposes, the salient charges of the complaint allege that Borsody and Dahan violated the IFPA by knowingly assisting Neuner in the creation and operation of a multi-disciplinary practice whose insurance claims were fraudulent under the IFPA. Allstate's theory of the case relies not on any false claim submitted by Neuner's practice, but on the practice's failure to comply with governing standards on the corporate practice of medicine, a necessary precondition to a valid insurance claim.

2.

At the bench trial, Neuner and others testified to the facts already described about the lectures, the roles that Borsody and Dahan played in the establishment and structure of the Northfield practice, and the respective roles of the various parties. Borsody also testified about his knowledge of relevant legal restrictions concerning multi-disciplinary practices, which testimony deserves separate attention.

Borsody described the information he conveyed in his lectures at Practice Perfect seminars. He stated that he covered "the legal aspect of the multi-disciplinary structures," including the decision in Finley and a case from Texas that he deemed relevant. Specifically, Borsody referenced Flynn Bros., Inc. v. First Medical Associates, 715 S.W.2d 782 (Tex. App.

19

1986), which involved the issue of whether, as a result of a management company's inappropriate influence over a medical practice, the management company effectively engaged in the unlicensed practice of medicine.[2]

Borsody acknowledged in his testimony that he was familiar with the Earle I letter and had considered it when developing the material covered in the lectures.  He described the lectures as covering the corporate-practice-of-medicine doctrine, including its application in New Jersey, although he stated that he did not discuss N.J.A.C. 13:35-6.16 specifically.

In his testimony, Borsody explained that he developed the practice model after a previous experience in which chiropractor clients of his lost their investment in a multi-disciplinary practice because the doctor they were working with "walked off with the practice."  Accordingly, the model Borsody developed to prevent that from happening again relied on terms in the equipment lease, property lease, and management contract between the medical corporation and the management company, which

---

[2]  The opinion in Flynn Bros., supra, explains that under Texas law, "when a corporation comprised of lay persons employs licensed physicians to treat patients and the corporation receives the fee, the corporation is unlawfully engaged in the practice of medicine."  715 S.W.2d at 785.  Although the doctor in that case was not an employee under the management agreement, the court found that "the practical effect was the same" because the contractual arrangements between the doctor's practice and the management company "[were] developed to do indirectly that which [the company's owners] freely concede[d] they could not do directly under the Medical Practices Act."  Ibid.

20

"[made] it look as tough as possible" for the designated medical director to take control of the practice.  Those provisions, which were implemented in Northfield's governing documents, included a security interest held by the management company in all of the medical corporation's assets and a $100,000 termination penalty should the medical corporation breach its lease.

Borsody asserted that he believed his model was lawful based on his reading of Finley and the laws of various states where he advocated that model.  He testified that, during the period at issue, "most states" required "the medical practice [to be] under the supervision and control of a licensed medical doctor" and "every State, including New Jersey, prohibited chiropractors from employing medical doctors."  However, he testified that he thought that vesting "bare legal title" of the medical practice in a medical doctor was sufficient to comply with those prohibitions.  According to Borsody, it was not clear that medical practices using his model might violate New Jersey law until the Law Division issued its decision in Allstate Insurance Co. v. Schick, 328 N.J. Super. 611 (Law Div. 1999).[3] Borsody also emphasized that he advised Practice Perfect

---

[3]  Schick, supra, held that medical corporations violate the IFPA if they submit claims to insurers while under the "dominion and control" of non-physicians.  328 N.J. Super. at 628.

attendees to retain local counsel who could confirm that his model complied with local law.

In addition to hearing testimony from Borsody, as well as Dahan, the court heard from a number of experts on the healthcare laws at issue.

C.

Based on the record presented, the trial court found that Borsody and Dahan violated the IFPA when they "knowingly assisted, conspired with and urged Neuner to operate in a fashion that violated the law." The trial judge rejected defendants' argument that, because the law was unclear prior to the Law Division's decision in Schick, the evidence did not establish a knowing violation of the Act. In doing so, the court made combined conclusions of law and findings of fact that were, in part, credibility-based.

The judge observed that both Flynn Bros. and the Earle I letter, each of which Borsody was admittedly familiar with, established "the clear proposition that subterfuge in developing medical practices is untenable." The court focused on the facts showing that a chiropractor was really in control of this medical practice, although on paper there was a trail suggesting otherwise. Despite Borsody's claimed lack of knowledge of a violation of regulatory requirements, or that a regulatory misstep would provide a platform for a finding of an IFPA

22

violation for assisting another to submit fraudulently ineligible medical claims, the trial court found the evidence otherwise. In a Statement of Reasons, the trial court set forth the essence of its determination:

> Borsody and Dahan promoted what they knew was essentially a lie. The business model they promoted was intended to appear to be one way and yet, in reality, be another way. They both were motivated to provide to the chiropractor the ability to manage a practice which included medical doctors. Dahan knew that a chiropractor could not own a majority interest of a multi-disciplinary practice since his California corporation was established so that he was a minority shareholder himself. Borsody knew that he was placing in the hands of the chiropractor the control that was lacking in his first experience in New York. The simple fact that the practice was intended to look as though a medical doctor was in control yet, with various side agreements, he was not, constitutes a sufficient basis for the Court to conclude that Borsody knew what he was doing was not proper.

The trial judge rejected defendants' claimed reliance on the Deputy Attorney General's guidance letter, issued after Northfield was established, and found that, at best, defendants had exhibited "willful blindness" to the illegality of the model at issue.

In an unpublished opinion, the Appellate Division reversed the trial court's judgment based on the panel's conclusion that the evidence did not support a finding that defendants knowingly violated the IFPA. The panel noted that in his lectures Borsody

23

discussed the requirement that only a medical doctor was permitted to own the majority share of a medical corporation and that, in light of the existing case law and informal guidance, Borsody had a basis to believe his model was lawful.[4] The Appellate Division found it relevant that the practice model "was similar to others used in business between corporations to enable the exercise of economic control." Expanding its discussion to Dahan, and noting that the IFPA does not define "knowing," the Appellate Division concluded that "[t]here is not sufficient evidence that New Jersey law at the time was settled enough to hold [him] responsible for knowing that the corporate structure he was advocating was illegal."

We granted Allstate's petition for certification. 223 N.J. 555 (2015). Amicus curiae status was granted to the Medical Society of New Jersey, the American Medical Association, and the New Jersey Dental Association.

### III.

### A.

In relevant part, the IFPA provides as follows:

> a. A person or a practitioner violates this act if he:
>
>> (1) Presents or causes to be presented any written or oral

---

[4] Like the trial court, the Appellate Division correctly placed no stock in defendants' arguments based on the letter-opinion issued by the Deputy Attorney General after the incorporation of Northfield.

24

statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy or the "Unsatisfied Claim and Judgment Fund Law," P.L.1952, c. 174 (C.39:6-61 et seq.), knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

(2) Prepares or makes any written or oral statement that is intended to be presented to any insurance company, the Unsatisfied Claim and Judgment Fund or any claimant thereof in connection with, or in support of or opposition to any claim for payment or other benefit pursuant to an insurance policy or the "Unsatisfied Claim and Judgment Fund Law," P.L.1952, c. 174 (C.39:6-61 et seq.), knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

(3) Conceals or knowingly fails to disclose the occurrence of an event which affects any person's initial or continued right or entitlement to (a) any insurance benefit or payment or (b) the amount of any benefit or payment to which the person is entitled.

[N.J.S.A. 17:33A-4(a)(1)-(3) (emphases added).]

N.J.S.A. 17:33A-4(b) further instructs that "[a] person or practitioner violates this act if he knowingly assists, conspires with, or urges any person or practitioner to violate any of the provisions of this act." Furthermore, N.J.S.A.

25

17:33A-4(c) provides that "[a] person or practitioner violates this act if, due to the assistance, conspiracy or urging of any person or practitioner, he knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act."

In pertinent part, defendants were found to have knowingly assisted or conspired with Neuner in violating the IFPA under N.J.S.A. 17:33A-4(b) by promoting and helping Neuner with the construction of an impermissible professional practice structure that enabled the chiropractor to benefit from proceeds derived from his submission of medical claims for reimbursement, in violation of the act, N.J.S.A. 17:33A-4(a), (c). Proof of such violation need only be found to exist based on a preponderance of the evidence. See Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 174-75 (2006) (holding that "the proper standard of proof is a preponderance of the evidence" as opposed to "clear and convincing evidence").

## B.

The parties' disagreement before this Court centers on the standard for a knowing violation under the IFPA and its application in this instance.

## 1.

Allstate focuses on the error it perceives in the standard applied by the Appellate Division, which hinged on whether there

26

was any dispositive case or interpretive guide to instruct defendants that (1) the practice structure involved here contravened medical practice requirements or restrictions, and (2) the regulatory failing would provide a basis to support a knowing IFPA violation for promoting and assisting in the construction of such an impermissible practice used to submit medical insurance claims.

Allstate maintains that the trial court had sufficient evidence to support the finding of a knowing violation of the IFPA. It urges application of a plain-meaning understanding of the term "knowing" using the concept of awareness of illegality, taking into account the reasonableness of the basis for defendants' claimed lack of knowledge of illegality.

Allstate argues that the trial court had ample evidence from which to infer defendants' knowledge that their practice model, denoted by Allstate as the "Doc-in-the-Box" model, violated the permissible medical practice requirements in New Jersey as those standards were stated in regulation and explained by regulatory agents, in particular through the Earle I letter-opinion. Moreover, Allstate points to the trial court's reliance on defendants' efforts to conceal the real impact of the chiropractor-owner's control over the medical practice in theory and in reality through the interconnected

27

management and other contracts and agreements, supporting a knowing violation of the IFPA.

In rebutting defendants' arguments, Allstate argues that although Schick "was the first case to hold expressly that [d]efendants' sham Doc-in-the-Box scheme was illegal in New Jersey," nothing in that opinion "suggest[ed] that the [issue] was a difficult or even a close call."[5] Schick involved many of the same players involved in this action, but Allstate claims that defendants do not get a free pass until the Schick court declared them to have engaged in an illegal practice scheme. In a similar vein, Allstate points to Varano, Damian & Finkel, L.L.C. v. Allstate Ins. Co., 366 N.J. Super. 1 (App. Div. 2004), as further demonstrating that the illegality of defendants' "Doc-in-the-Box" scheme was not a close question. As in Schick, the Varano matter involved Dr. Sica as the "nominal" owner of a medical practice, Ramsey Medical, which, like Northfield, was

_____

[5] Allstate would have us note that the Schick matter involved similar facts to the present case: (1) Dr. Sica was the nominal owner of five of the "sham medical centers"; (2) Dr. Sica signed "undated resignation letters and stock assignments"; and (3) the Schick "[d]efendants used management companies and service agreements similar to those used by Neuner . . . to control the hiring of physicians and to extract all of the profits from the medical centers." As Allstate notes in its briefing to this Court, the Schick court concluded that "[i]t would be difficult to conceive of a network of healthcare and management facilities better designed to facilitate the funneling of PIP benefits into the hands of non-licensees than the complex enterprises devised and operated by the defendants herein" (quoting Schick, supra, 328 N.J. Super. at 621).

28

controlled by a chiropractor through the use of a management company and service contract. Allstate contends that the Appellate Division readily found the practice structure in Varano illegal. Allstate relies on language in Varano that "[i]t [was] apparent from even a cursory review of Allstate's allegations and the relevant case law that plaintiffs' conduct, as portrayed by Allstate, constituted a serious breach of law and policy." Varano, supra, 366 N.J. Super. at 8. According to Allstate, "[t]he fact that the Schick and Varano decisions were not handed down until after the Practice Perfect Seminar [attended by Neuner] cannot override the obvious fact that the corporate structure advocated by Borsody and Dahan relied on subterfuge."

2.

As defendants see it, the Appellate Division rightfully expressed concern that an ordinary-meaning definition of "knowing" -- one that considers whether defendants were "aware of" or "had knowledge" of the illegality of their actions -- might not establish, through proof by a preponderance of the evidence, a knowing violation of the IFPA under N.J.S.A. 17:33A-4(b) and (c), where the alleged violators made no direct submission to the insurer themselves. Defendants stress that violation of the IFPA would require their knowledge both of the illegality of the practice structure they are charged with

29

promoting and assisting Neuner in establishing and that promotion and assistance with that non-compliant medical practice would lead to an IFPA violation based on the practice's submission of insurance claims.

Although the panel stated that it did not adopt the Criminal Code definition of "knowing" found in N.J.S.A. 2C:2-2(b)(2), which defendants had urged before the panel, defendants' argument before us in essence continues to rely on the meaning of "knowing" in the Criminal Code. Defendants argue that a demonstration of actual knowledge or awareness of illegality is the level of knowledge that should be necessary under an ordinary-meaning application of "knowing" in this context. In the alternative, defendants contend that under the Criminal Code's requirement in N.J.S.A. 2C:2-2(b)(2), a defendant must be shown to have (a) acted "knowingly with respect to the nature of his conduct or the attendant circumstances," and (b) acted "knowingly with respect to a result of his conduct," requiring proof that he was "aware that it is practically certain that his conduct will cause such a result." Defendant Borsody, in particular, contends that Allstate could not show that his conduct was practically certain to cause Neuner and Northfield to file false or misleading claims, or that he was practically certain at the time of his

30

conduct that the false or misleading information in those claims would be material to an insurer such as Allstate.

Defendants now ask this Court to endorse the standard that the panel utilized, which would require Allstate's proofs to establish that Borsody and Dahan had to know, from dispositive case law or other binding interpretive action, that the practice model defendants devised and promoted for use by Neuner violated New Jersey statute or regulation. According to the panel, that standard was not met in this matter. The panel also rejected willful blindness as an acceptable standard for a knowing violation when the violation involves the interpretation of a statutory or regulatory requirement.

In urging this Court to affirm the proof standard applied by the Appellate Division, defendants assert that, until the definitive 1999 decision in Schick declared the practice structure at issue to be in violation of law, defendants could not, and should not, be held to have knowingly violated the IFPA. Further, defendants maintain that, until Allstate Insurance Co. v. Orthopedic Evaluations, Inc., 300 N.J. Super. 510 (App. Div. 1997), no defendant would have known that a mere violation of regulatory restrictions applicable to the business structure of a medical practice could render invalid and ineligible a medical-service insurance claim, and thus place at

31

risk the third party who assisted in the promotion and construction of that form of medical practice.

Amicus New Jersey Dental Association urges the Court to import the Legislature's definition of "knowing" from New Jersey's False Claims Act, N.J.S.A. 2A:32C-1 to -15, -17 to -18, or, alternatively, to apply the Criminal Code definition. The remaining amici argue against application of the False Claims Act definition and emphasize that a plain-language understanding of "knowing" does not include concepts of recklessness or constructive knowledge.

IV.

A.

The standards we apply in reviewing the findings and conclusions of a trial court following a bench trial are well-established:

> [W]e give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions. See Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-84 (1974). Reviewing appellate courts should "not disturb the factual findings and legal conclusions of the trial judge" unless convinced that those findings and conclusions were "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Id. at 484 (citation and internal quotation marks omitted); see, e.g., Seidman v. Clifton Sav. Bank, 205 N.J. 150, 169 (2011) (same).

32

[Griepenburg v. Township of Ocean, 220 N.J. 239, 254 (2015); see also H.S.P. v. J.K., 223 N.J. 196, 215 (2015).]

Questions of law receive de novo review. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

B.

In this matter, we are called on to assess the trial court's application of a "knowing" standard that is required for a violation of the IFPA, specifically N.J.S.A. 17:33A-4(b) (instructing that "[a] person or practitioner violates this act if he knowingly assists, conspires with, or urges any person or practitioner to violate any of the provisions of this act"); see also N.J.S.A. 17:33A-4(a), (c).

This is not a criminal case. And, the Legislature did not incorporate the criminal definition of a "knowing" mens rea in its adoption of a knowing violation for IFPA civil liability, as is applicable in criminal insurance fraud prosecutions. See N.J.S.A. 2C:21-4.6. The trial court rightly did not import aspects of a "knowing" mens rea from the Criminal Code into the civil liability section of the IFPA at issue. Rather, the court correctly applied a plain-language understanding of "knowing" as a term of normal language usage for the Legislature to have employed in the IFPA. There is no need for contortions in understanding the word. "Knowing" is well understood to be an awareness or knowledge of the illegality of one's act. See

33

Knowing, Black's Law Dictionary 950 (9th ed. 2009) ("[h]aving or showing awareness or understanding; well-informed"). That knowledge need not come from a prior decision holding that the precise conduct at issue gives rise to a violation of a legal requirement.

There is ample precedent supporting the proposition that a party's knowledge as to the falsity or illegality of his conduct may be inferred from the surrounding factual circumstances. This Court has held, in a prosecution for false swearing, that proof that a defendant's statement was knowingly false "need not be met by direct evidence. The intent may be inferred from the circumstances surrounding the occurrence, the defendant's demeanor, his intellect, etc." State v. Haines, 18 N.J. 550, 562 (1955) (applying N.J.S.A. 2A:131-6 (repealed 1978) (current version at N.J.S.A. 2C:28-2)). "[A]s has oftentimes been stated, circumstantial evidence is not only sufficient but may also be 'more certain, satisfying and persuasive than direct evidence.'" State v. Goodman, 9 N.J. 569, 581 (1952) (quoting State v. O'Connor, 134 N.J.L. 536, 539 (Sup. Ct. 1946)).

"Inferring mental state from circumstantial evidence is among the chief tasks of factfinders." United States v. Wright, 665 F.3d 560, 569 (3d Cir. 2012) (explaining that jury may permissibly rely on circumstantial evidence to reach verdict on federal conspiracy and fraud charges); see also United States v.

34

Brodie, 403 F.3d 123, 147 (3d Cir. 2005) ("A jury may infer a willful violation of a known legal obligation from the facts and circumstances surrounding the case."). In the criminal context, the prosecution "can prove the requisite mental state through either direct evidence or circumstantial evidence." McFadden v. United States, 576 U.S. ___, 135 S. Ct. 2298, 2304 n.1, 192 L. Ed. 2d 260, 269 n.1 (2015). In a civil action under the IFPA, no less than in a criminal trial, the defendant's knowledge of a violation may be proven by circumstantial evidence.

With that standard in mind, we turn to defendants' argument that knowledge in this instance could come only from a prior decision that would have, or should have, informed defendants of the certainty of the illegality of their practice model. And, further, we address the argument that defendants similarly required a definitive holding that would have informed them that a regulatory business-practice requirement, relating to permissible practice models, could provide the platform from which a knowing violation of the IFPA could emanate. We address the latter first.

V.

A.

Defendants claim that, even if their practice model violated the Board's regulations governing the permissible business structures for the organization of a medical practice,

35

defendants could not have knowingly violated the IFPA because it was not clear at the time that compliance with those practice-structure regulations was "material" to insurance claims submissions. See N.J.S.A. 17:33A-4. Defendants seemingly concede that the Appellate Division's May 1997 decision in Orthopedic Evaluations, Inc., supra, 300 N.J. Super. at 516-17, at about the time that Northfield was being incorporated, was the earliest point at which practitioners could have known that the Board's regulatory provisions are material for purposes of insurance coverage.

We do not accept the proposition that, prior to Orthopedic Evaluations, Inc., a reasonable actor would not have known that compliance with the regulatory provisions governing the organization, supervision, and control of a medical practice was material to an insurance submission by that medical practice. Addressing coverage under the Automobile Reparation Reform Act, N.J.S.A. 39:6A-1 to -35, the appellate panel in Orthopedic Evaluations, Inc., supra, observed that "[a] fair reading of the Act . . . requires the conclusion that any healthcare service authorized by the Act, in order to be eligible for recognition, must also comply with any other significant qualifying requirements of law that bear upon rendition of the service." 300 N.J. Super. at 516. As a matter of public policy, "[t]he law should accord no recognition to such entities and operations

36

which place the public at risk by failing to provide the professional supervision and control deemed essential by the Board." Id. at 517. See also Varano, supra, 366 N.J. Super. at 6 (same); Prudential Prop. & Cas. Ins. Co. v. Midlantic Motion X-Ray, Inc., 325 N.J. Super. 54, 60 (Law Div. 1999) ("The failure of a [healthcare] provider or service to adhere to [N.J.A.C. 13:35-2.5(b)], or any other significant state statute or agency regulation, renders that provider or service ineligible for reimbursement under [N.J.S.A. 39:6A-1 to -35].").
The theory of all those cases reflects that in New Jersey a practice entity must comply with all statutes and regulations governing the permissible structures for control, ownership, and direction of a medical practice, including the use of professional services interconnected with a medical practice.

Health care services are highly regulated, and professionals engaged in the provision of health care -- including persons such as defendants, who undertook to facilitate that activity -- are on notice of the legal requirements applicable to their practice and operations. Material Damage Adjustment Corp. v. Open MRI of Fairview, 352 N.J. Super. 216, 227 (Law Div. 2002). We do not deal here with an honest mistake made in the course of completing a reimbursement form submitted to an insurer. This case goes to the basic structure of a practice and how it is owned,

controlled, and directed.  Those concerns go to the core of who may practice medicine in this State.  The practice of medicine is a privilege to be exercised in accordance with all licensing and practice requirements and restrictions.  One cannot claim, or feign, ignorance of those regulatory requirements and restrictions until there is an express command applicable to a precise set of facts.

Accordingly, we turn next to the regulatory requirements in place governing the lawful structures for medical practices when Borsody and Dahan promoted their practice model and the manner in which their model was constructed to work on paper and in practice.

B.

As previously discussed, N.J.A.C. 13:35-6.16 establishes the proper structure of a medical practice and incorporates the manner in which the corporate practice of medicine may be employed.  See N.J.A.C. 13:35-6.16(f)(1)-(3).  Subsection (f)(3) defines employment as "an ongoing associational relationship between a licensee and professional practitioner(s) or entity on the professional practice premises for the provision of professional services, whether the licensee is denominated as an employee or independent contractor, for any form of remuneration."  In adopting section 6.16 in 1992, the Board explained that subsection (f)(3) bars "a licensee with a more

38

limited scope of practice -- however competent within the scope of license -- [from] professionally supervis[ing] the quality of work of a plenary licensee." 24 N.J.R. 626, 630 (1992). N.J.A.C. 13:35-6.16(f)(3)(i) states simply and without ambiguity that a practitioner with a plenary license "shall not be employed by a practitioner with a limited scope of license."

Although N.J.A.C. 13:35-6.16 allows for a solo practice as well as a partnership or professional association, employment is broadly defined to include even an ongoing associational relationship between a licensee and a professional practitioner or entity on the professional practice premises for the provision of professional services, regardless of whether the plenary licensee is labelled an employee or independent contractor. Within the breadth of the concept of "employment," the regulation reinforces the theme of maintaining professional discretion in form and substance, depriving anyone or any corporate entity of the opportunity to control or attempt to exert control over the exercise of professional discretion by a plenary licensee. See ibid. That protection against control over the plenary licensee is brought about through the clear prohibitions expressed through the concept of employment in the regulation. In addition, the Earle I opinion also clearly states the same.

In answering the question put to the Board, the Earle I letter addresses many ways in which the formal design of a corporate medical practice would have an impermissible corrosive effect on the professional discretion expected to be exercised by the plenary licensee. The guidance informs that the formal design of the relationship is not dispositive of whether there is the risk of inappropriate encroachment on a plenary licensee's discretion. The letter states expressly, "[w]hile we recognize that it is nominally the Professional Association which is the 'employer' rather than the chiropractor, for our purposes that would be a distinction without a difference." The thrust of the entire Earle I letter makes plain that the Board would allow no subterfuge to shield the existence of a real or potential corrupting influence that could be exercised by a management company or by a professional association where a licensee with a lesser scope of practice, like a chiropractor, could actually wield control over the practice of medicine by a plenary licensee.

C.

Based on the regulations in effect at the time and the testimony at trial, the trial court here could reasonably conclude that Borsody, as well as Dahan, knew of the regulatory requirements at issue, promoted a practice scheme specifically designed to circumvent those requirements while appearing

40

compliant, and therefore knowingly assisted in the provision of services, the foreseeable result of which was the submission of invalid and misleading claims under the IFPA.

Based on the plain language of the regulation and the clarity of expression in the guidance of Earle I, we find no basis for crediting the argument that defendants could not have known that their structure violated the Board's regulatory requirements. The documents and structure promoted and designed by defendants accomplished what the regulations sought to avoid. They placed control over the medical practice in the hands of a chiropractor, subjecting plenary licensees to his effective control through interconnected contracts and the imposition of the threat of substantial monetary penalties. Importantly, the plan sought to conceal those features to appear compliant.

The scheme vested bare legal title in a physician. However, the physician, besides being subject to direction and financial control by a chiropractor-owner of a management company, in reality was a stranger to the medical practice and was not operationally in control, having been demonstrated to have "sold" her license to multiple practices utilizing the so-called "Doc-in-the-Box" structure in New Jersey and many other states. In fact, she was recommended to Neuner for use as the nominal medical owner of Northfield. And, when she and Neuner had a disagreement, the veneer of her "control" over the

41

practice was shattered.  The chiropractor exercised his ability to utilize her previously required, undated resignation form and affidavit of non-issued or lost certificate to make it appear that she voluntarily transferred her "ownership" in Northfield to the next medical doctor, who was selected by Neuner to own the medical practice.

That structure was found by the trial court to have violated the requirements governing ownership, control, and direction of a medical practice.  The trial court reached its conclusions based on those harsh facts, having heard the witnesses and examined the structure of this practice design, formulated in such a way as to make it appear that a medical doctor was "in charge" of the Northfield practice.

Clearly, with the 1999 decision in Schick, supra, the practice structure at issue here was first held to constitute both a violation of N.J.A.C. 13:35-6.16's form-of-practice requirements and a potential avenue for finding an IFPA violation.  328 N.J. Super. at 621.  As noted in the parties' arguments, following that decision, other courts have reasoned similarly.  See, e.g., Varano, supra, 366 N.J. Super. at 6 ("A provider in violation of N.J.A.C. 13:35-6.16 is not eligible to receive PIP benefits.").  That said, we reject the contention that the Schick decision was required to have been issued in order to render the practice structure here incompatible with

42

regulatory requirements and to provide a platform for a conclusion that a knowing IFPA violation could be proved under N.J.S.A. 17:33A-4(b).

Here, there was an abundance of proof that the contracts and penalties -- imposed on the doctor named as nominal owner in title of this practice -- placed control of the medical practice in the hands of a chiropractor. That clearly supported finding is not overcome by any form-over-substance argument based on the placement of bare legal title in the plenary licensee who participated in this scheme. The trial court demonstrated clarity of vision in recognizing that this medical practice structure violated both the letter and spirit of the Board's rule.

Moreover, the lengths that defendants went to in shielding the true controller of this practice from view undermine any basis for interfering with the trial court's assessment of the mixed question of fact and law that was presented to the court. It is apparent to us, as a reviewing court, that the fact-finder was also incorporating credibility findings in assessing the reasonableness of the scheme defendants were seeking to defend in this IFPA matter. We extend a wide berth of deference to the fact-finder in such matters. Considering all of the circumstances involved in defendants' interactions with Neuner, the trial court could reasonably conclude that defendants

knowingly assisted Neuner in violating the Board's rules and submitting ineligible and fraudulent medical claims for reimbursement through that practice structure, contrary to law.

In conclusion, knowledge or a "knowing" state of mind for purposes of a statutory civil violation under the IFPA may be inferred here.  We find ample evidence to support the trial court's finding of the existence of an IFPA violation on this record.

## VI.

The judgment of the Appellate Division is reversed, and the case is remanded for proceedings consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE LaVECCHIA's opinion.  JUSTICE ALBIN did not participate.