**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3321-22

AMERICAN GUARANTEE AND
LIABILITY INSURANCE COMPANY,

    Plaintiff-Respondent,

v.

VICTORY HIGHLANDS
CONDOMINIUM ASSOCIATION, INC.,
and MARSHALL & MORAN, LLC,

    Defendants,

and

LARRY CHENAULT,

    Defendant-Appellant.

_____

        Argued on October 29, 2024 – Decided December 26, 2024

        Before Judges Gilson, Firko and Augostini.

        On appeal from the Superior Court of New Jersey, Law
        Division, Essex County, Docket No. L-8231-18.

Carl A. Salisbury argued the cause for the appellant (Bramnick, Rodriguez, Grabas, Arnold & Mangan, attorneys; Carl A. Salisbury, on the briefs).

Gabriel E. Darwick argued the cause for the respondent (White and Williams, LLP, attorneys; Gabriel E. Darwick and James Layman, on the brief).

PER CURIAM

This case involves an insurance dispute regarding liability coverage for toxic mold exposure under commercial umbrella liability policies.[1] Defendant Larry Chenault (Chenault) appeals from two orders: (1) an October 17, 2019 order granting reconsideration of plaintiff American Guarantee and Liability Insurance Company's (Zurich)[2] motion for summary judgment; and (2) a May 24, 2023 order, which was entered following a bench trial, and which, in relevant part, denied coverage under the consumption exception to the mold exclusion, the first manifestation rule, and continuous trigger theory.

---

[1] "[Commercial General Liability] policies protect business owners against liability to third parties, encompassing a wide variety of potential claims." Cypress Point Condo. Ass'n v. Adria Towers, L.L.C., 226 N.J. 403, 408 n.1 (2016) (citing 3 Jeffrey E. Thomas, New Appleman on Insurance, Law Library Edition § 16.02[3][a][i] (2015)).

[2] At oral argument, counsel for plaintiff American Guarantee and Liability Insurance Company explained that Zurich American Insurance Company (Zurich) is the parent company. Thus, we refer to plaintiff as Zurich in this opinion.

2

A-3321-22

Chenault lived in a condominium complex owned by Victory Highlands Condominium Association (VHCA). Allegedly he suffered injuries after being exposed to toxic mold caused by a crack in the foundation of the building, which caused water to seep into Chenault's condo. In 2010, Chenault sued VHCA and its property manager, Marshall and Moran (M&M). The parties settled in May 2012, and the settlement agreement contained a provision that the lawsuit could be reopened if Chenault found liability insurance policies issued to VHCA or M&M.

In 2014, the court permitted Chenault to reopen the lawsuit, and he filed an amended complaint against VHCA, M&M, and four liability insurers that had issued policies to VHCA during the applicable period. In December 2018, Chenault settled with VHCA and three of the insurance carriers but did not settle with Zurich. The December 2018 settlement agreement superseded the settlement agreement of May 2012.

On May 7, 2018, Zurich filed the present declaratory judgment action against VHCA and M&M, and Chenault was named an interested party. VHCA and M&M did not participate in the case. On May 24, 2019, the motion judge denied the parties' cross motions for summary judgment. However, on October 17, 2019, the motion judge granted Zurich's motion for reconsideration and held

that Appleman's Rule, "pursuant to which the loss is covered if a covered cause starts or ends the sequence of events leading to the loss,"[3] did not apply to the commercial liability insurance policies such as those issued by Zurich.

Following a bench trial on the issue of the reasonableness of the settlement and on whether the consumption exception to the mold exclusions applied, the trial judge held the settlement was reasonable and the exception to the mold exclusion did not apply. Therefore, the trial judge concluded Zurich had not breached its duty to defend or indemnify.

We have considered these arguments in light of the record and applicable legal standards. We affirm.

I.

We briefly recount the salient, undisputed facts and procedural history derived from the record. From 1991 until Spring 2009, Chenault lived in a condo he purchased in a complex owned and managed by VHCA. During this time, water infiltrated the unit through a leak in the basement. After complaining about the problem and requesting that it be remediated, VHCA attempted some remediation work. In March 2009, the premises were inspected, and significant

---

[3] Flomerfelt v. Cardiello, 202 N.J. 432, 447 (2010).

toxic mold levels were discovered. Chenault moved out of the property and never resided there again.

A. Underlying Negligence Litigation.

On April 15, 2010, Chenault filed a complaint against VHCA and M&M for the injuries he suffered because of the mold in the condo. He asserted claims for negligence; nuisance; breach of the implied right of quiet enjoyment; breach of a contractual obligation or the implied covenant of good faith and fair dealing to repair an exterior leak; and breach of the implied warranty of habitability.

Chenault specifically alleged that he suffered personal injuries because he "inhaled toxic mold" as follows: "As a direct and proximate result of the actions, or inactions, of the [d]efendants, which were willful, wanton, reckless, and intentional, [p]laintiff's unit became uninhabitable and he inhaled toxic mold and sustained severe permanent injuries." In addition to personal injuries, Chenault alleged damage to his real and personal property.

During the years Chenault lived in the condo, VHCA purchased several insurance policies through several different insurance companies, including five commercial umbrella liability policies issued by Zurich to VHCA between June 1, 2005 and June 1, 2010.

The Zurich policies provided two forms of coverage: Coverage A provided "excess follow form liability insurance," and Coverage B provided "umbrella liability insurance." Coverage A did not apply because the underlying primary liability policies had mold exclusions and did not provide primary liability coverage for Chenault's clams. Coverage B, the umbrella policy, provided:

> Under Coverage B, we will pay on behalf of the insured, sums as damages the insured becomes legally obligated to pay by reason of liability imposed by law or assumed under an insured contract because of bodily injury, property damage, or personal or advertising injury covered by this insurance but only if the injury, damage or offense arises out of your business, takes place during the policy period of this policy and is caused by an occurrence happening anywhere.

However, each of the five Zurich policies contained a fungus liability exclusion provision, which restricted coverage for mold damages. Beginning with the two policies covering the periods June 1, 2005 to June 1, 2006, and June 1, 2006 to June 1, 2007, the exclusion in those policies stated:

> FUNGUS LIABILITY EXCLUSION
>
> . . . .
>
> Under Coverage A and B this policy does not apply to any liability, damage, loss, cost or expense, arising directly or indirectly, in whole or in part, by:

6

A-3321-22

1.  Any "fungus(i)" or "spore(s)";

2.  Any substance, vapor or gas produced by or arising out of any "fungus(i)" or "spore(s)"; or

3.  Any material, product, building component, building or structure that contains, harbors, nurtures or acts as a medium for any "fungus(i)" or "spore(s)".

It is agreed that this exclusion applies regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to that injury or damage.

Definitions

As used in this endorsement:

1.  "Fungus(i)" includes, but is not limited to, any form for type of mold, mushroom or mildew.

2.  "Spore(s)" means any reproductive body produced by or arising out of any "fungus(i)".

The three policies for periods from June 1, 2007, to June 1, 2010 similarly included a fungus liability exclusion provision:

Fungus or Bacteria Exclusion –
All States Except New York

. . . .

Under Coverage A and Coverage B this policy does not apply to any liability, damage, loss, cost or expense:

7

A.  Caused directly or indirectly by the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any:

1.  Fungi, or bacteria; or

2.  Substance, vapor or gas produced by or arising out of any fungi or bacteria.

B.  Arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, fungi or bacteria, by any insured or by any other person or entity.

Definitions

As used in this endorsement:

1.  Bacteria means any type or form of bacteria and any materials or substances that are produced or released by bacteria.

2.  Fungi means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or by-products produced or released by fungi.

3.  Spores means reproductive bodies produced by or arising out of fungi.

This exclusion does not apply to any fungi or bacteria that are, are on, or are contained in, an edible good or edible product intended for human or animal consumption.

A-3321-22

In May 2012, Chenault settled the lawsuit with VHCA and M&M for a total of $110,000.00. However, the settlement agreement contained a "Reservation of Rights as to Applicable Insurance Coverage" provision that permitted Chenault "to retain an expert in the field of Insurance and Archaeology and Reconstruction to determine coverage under [VHCA's and M&M's] existing or historical policies." The provision further stated that in the event such coverage was identified, Chenault would have "the right to maintain his claim against [VHCA and M&M] for the sole purpose of attempting to recover under such . . . polic(ies) for damages in excess of [$110,000.00]." Thus, the provision permitted Chenault to seek damages in excess of $110,000.00 from applicable insurance policies of VHCA and M&M but no further sums could be collected from VHCA or M&M. At the same time, Chenault would be responsible for indemnifying VHCA and M&M "with respect to and against any subrogation claim against either or both of them or liability for subrogation by either or both of them on account of any insurance recovery or proceeds payable to Chenault."

In an order dated June 20, 2014, the court permitted Chenault to reopen the lawsuit. Chenault filed his first amended complaint against VHCA, M&M, and multiple insurance companies, including Zurich, that had issued liability

9

policies to VHCA for the years when Chenault alleged he was exposed to mold. In addition to the causes of action previously asserted, he alleged separate declaratory judgment claims against each of the insurance companies. In a letter dated January 31, 2014, Zurich advised VHCA of its denial of coverage based on the fungus liability exclusions in its policies.

In the amended complaint, Chenault alleged he "suffered and continues to suffer serious, adverse health consequences caused by his ongoing, continuous injurious exposure to toxic mold from 1991 through June 2010." He did not allege that the toxic mold affected his food items or that he was injured by ingesting mold-affected food items in his condo. Chenault also contended that the Zurich policies between June 1, 2007 through June 1, 2010 provided coverage because these policies "d[id] not contain an exclusion for mold-related bodily injury or property damage if the efficient proximate cause of the formation of injurious toxic mold is a non-excluded cause, such as water intrusion."

In 2015, we granted Zurich leave to file an interlocutory appeal, and on November 21, 2016, we reversed the court's order that allowed claims against the insurance companies to proceed before the conclusion of Chenault's claims

A-3321-22

against VHCA and M&M.[4] We remanded for disposition of the liability claims against VHCA and M&M.

On remand, three insurance companies defended VHCA, but Zurich did not. On November 20, 2018, Zurich filed the present action seeking a declaratory judgment that its policies did not cover Chenault's claims. In December 2018, Chenault, VHCA and the remaining insurance companies, excluding Zurich, entered a settlement agreement and release that superseded the prior settlement agreement of May 2012. The parties agreed to a consent judgment for $2,288,725.00 against VHCA, with the settling insurance companies paying $310,000.00 of that judgment on behalf of themselves and VHCA.

B. Zurich's Declaratory Judgment Litigation.

After filing a declaratory judgment action in federal court against VHCA and M&M, which was dismissed, Zurich filed the present declaratory judgment action in November 2018 against VHCA and M&M, with Chenault named as an interested party. Zurich sought a declaratory judgment that the five commercial umbrella liability policies it issued to VHCA for the period of June 1, 2005 to

---

[4] Chenault v. Victory Highlands Condo. Ass'n, Inc., No. A-3626-14 (App. Div. Nov. 21, 2016).

June 1, 2010, covering both VHCA and M&M, did not provide coverage for the injuries to Chenault in the underlying negligence lawsuit, and Zurich had no duty to defend or indemnify VHCA or M&M for the claims Chenault asserted against them for toxic mold injuries.

In setting forth the facts in his answer and counterclaims and describing the underlying negligence litigation, Chenault stated that he had been exposed to toxic mold and suffered injuries because of this exposure. He did not claim or refer to the ingestion of mold-affected food as causing his injuries. In his declaratory judgment claim, however, Chenault cited the consumption exception to some of Zurich's fungus liability exclusions in the policies.

He alleged "the mold exclusions in [the June 1, 2007 to June 1, 2010] policies do not bar Larry Chenault's claims for bodily and mental injury resulting from his consumption of edible food that was contaminated by mold spores released by the extensive toxic mold contamination in his condominium." He also cited the lack of "anti-concurrent cause clauses" in Zurich policies covering June 1, 2007 to June 1, 2010, and alleged "the mold exclusions in those policies do not bar coverage for mold-related bodily injury and property damage when the efficient proximate cause of the damage and injury is covered water intrusion or another, non-excluded, clause."

C.  October 17, 2019 Summary Judgment Order.

On February 1, 2019, Chenault filed an answer and crossclaim seeking to recover the remaining $1,978,725.00 of the settlement from Zurich.  Thereafter, Zurich filed for summary judgment, and Chenault filed opposition and cross-moved for partial summary judgment.  In an oral opinion and order dated May 24, 2019, the motion judge denied both motions.  Both parties moved for reconsideration.

In an oral opinion and order dated October 17, 2019, the motion judge granted Zurich's reconsideration motion, thereby granting summary to Zurich and finding the fungus liability exclusions in Zurich's policies barred coverage to VHCA and M&M in Chenault's underlying litigation, unless the consumption exception restored coverage.  The motion judge ruled, as a matter of law, that

> [t]he Appleman's sequential causation rule exists because the policy language in its first party property requires it.  Unlike first property policies, third party [commercial] policies like the [Zurich] policies lack any language supporting the expansion of the Appleman's rule and thus the [c]ourt is declining Chenault's unsupported request to apply the rule here.

The judge further noted that "[t]he plain language of the mold exclusion forecloses the application of the Appleman's [R]ule."  In reconsidering the prior order, the motion judge determined that the mold exclusion, as a matter of law,

13

"bars coverage because the efficient proximate cause doctrine does not apply." Therefore, the motion judge granted partial summary judgment to Zurich, reserving only the issue of whether the consumption exception restored coverage to Chenault for trial.

D. May 24, 2023 Order and Accompanying Bench Trial Decision.

A bench trial was held between October 11, 2022 and October 14, 2022 to determine if the consumption exception afforded coverage to Chenault and whether the underlying settlement is enforceable. Following trial, the trial judge, who was not the motion judge, issued an order and an accompanying fifty-two-page opinion finding the following:

> (1) the Consumption Exception to the Mold Exclusion was not triggered and thereby does not afford coverage to Larry Chenault's claims;
>
> (2) the Zurich Umbrella Policies at issue incepted after the initial manifestation rule and continuous trigger theory;
>
> (3) Zurich did not breach its duty to defend; and
>
> (4) Zurich cannot be bound by the underlying settlement as coverage was precluded by the Mold Exclusion in the Umbrella Policies and Zurich did not breach its duty to defend, although the [c]ourt found the settlement reasonable.

This appeal followed.

14

## II.

We review summary judgment orders de novo, applying the same standard as the motion judge applied. Stewart v. N.J. Tpk. Auth., 249 N.J. 642, 655 (2022); Cypress Point Condo., 226 N.J. at 414-15; Simonetti v. Selective Ins. Co., 372 N.J. Super. 421, 427 (App. Div. 2004). Summary judgment is appropriately granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c); Stewart, 249 N.J. at 655; Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528-29 (1995).

However, a trial court's findings of fact after a bench trial are entitled to deference. We must "give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions." Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015). We will not disturb a trial court's factual findings or legal conclusions unless they are so manifestly unsupported by the competent, relevant evidence that affirmance would result in an injustice. Allstate Ins. Co. v. Northfield Med. Ctr., 228 N.J. 596, 619 (2017); Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 483-84 (1974).

A. October 17, 2019 Summary Judgment Order.

15

Here, there are no material facts in dispute. The issue presented – the interpretation of an insurance policy – presents a question of law and is thus appropriate for summary judgment.

The legal principles governing insurance contract interpretation are well-settled. "[T]he general principles governing the interpretation of insurance policies . . . must be analyzed under the rules of 'simple contract law . . . .'" Cypress Point Condo., 226 N.J. at 415 (quoting Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960)). "[W]hen interpreting an insurance contract, the basic rule is to determine the intention of the parties from the language of the policy, giving effect to all parts so as to give a reasonable meaning to the terms." Simonetti, 372 N.J. Super. at 428 (citations omitted). If the terms of the contract are "clear and unambiguous," then "the court must enforce the contract as it is written; the court cannot make a better contract for the parties than the one that they themselves agreed to." Ibid. (citing Stone v. Royal Ins. Co., 211 N.J. Super. 246, 248 (App. Div. 1986)). On the other hand, if the language of the contract is ambiguous, then the ambiguity "must be resolved against the insurer." Ibid. (citing DiOrio v. N.J. Mfrs. Ins. Co., 79 N.J. 257, 269 (1979)).

"If the controlling language of the policy will support two meanings, one favorable to the insurer and one favorable to the insured, the interpretation

16

supporting coverage will be applied."  Ibid. (citing Corcoran v. Hartford Fire Ins. Co., 132 N.J. Super. 234, 243 (App. Div. 1975)); accord Cypress Point Condo., 226 N.J. at 416.  This is "in order to give effect to the insured's reasonable expectations."  Flomerfelt, 202 N.J. at 441.

"Yet, an insurance policy is not ambiguous merely because two conflicting interpretations have been offered by the litigants."  Simonetti, 372 N.J. Super. at 428 (citing Rosario v. Haywood, 351 N.J. Super. 521, 530-31 (App. Div. 2002)).  "A genuine ambiguity exists when the 'phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage.'"  Id. at 428-29 (quoting Lee v. Gen. Accident Ins. Co., 337 N.J. Super. 509, 513 (App. Div. 2001)).

"Exclusionary clauses are presumptively valid and are enforced if they are 'specific, plain, clear, prominent, and not contrary to public policy.'"  Flomerfelt, 202 N.J. at 441-42 (quoting Princeton Ins. Co. v. Chunmuang, 151 N.J. 80, 95 (1997)); Norman Int'l Inc. v. Admiral Ins. Co., 251 N.J. 538, 552 (2022).  However, "coverage clauses should be interpreted liberally, whereas those of exclusion should be strictly construed."  Simonetti, 372 N.J. Super. at 429 (citing Butler v. Bonner & Barnewell, Inc., 56 N.J. 567, 576 (1970)).  The burden is on

the insurer to establish that an exclusion applies.  Norman Int'l, 251 N.J. at 552; Flomerfelt, 202 N.J. at 442.

We begin our analysis with the language of the applicable coverage policies.  Here, the applicable coverage would be under Coverage B of the policies, which provides "umbrella liability insurance."  The contract under Coverage B provides:

> [W]e will pay on behalf of the insured, sums as damages the insured becomes legally obligated to pay by reason of liability imposed by law or assumed under an insured contract because of bodily injury, property damage, or personal and advertising injury covered by this insurance but only if the injury, damage or offense arises out of your business, takes place during the policy period of this policy and is caused by in occurrence happening anywhere.  We will pay such damages in excess of the Retained Limit specified by Item 5, of the Declarations or the amount payable by other insurance, whichever is greater.

Coverage B will not apply "to any loss, claim or suit for which insurance is afforded under underlying insurance or would have been afforded except for the exhaustion of the limits of insurance of underlying insurance."  The relevant timeframes in this case were from 2005 to 2010; however, Chenault conceded the 2005 and 2006 policies do not provide coverage based upon the language of the mold exclusion.  The focus here is on the mold exclusions contained in the 2007 to 2010 policies.

A-3321-22

As a result, the parties dispute whether the mold exclusion precludes coverage to Chenault under Coverage B of the policies. They disagree as to whether Appleman's rule, a rule regarding coverage for sequential causes of loss, applies to provide coverage to Chenault, thereby overcoming the mold exclusion.

Chenault contends the motion judge erred as a matter of law by holding that Appleman's Rule does not apply to general commercial liability policies, or third-party claims under policies issued by Zurich. Zurich asserts that because the mold exclusions in its policies are unambiguous and the exclusions bar coverage for Chenault's "mold-caused injuries," the motion judge correctly granted summary judgment. Zurich argues Chenault is "seek[ing] to circumvent the exclusion . . . by advocating for a groundbreaking expansion of the efficient proximate cause rule, also known as Appleman's [R]ule."

Our Supreme Court has adopted Appleman's Rule "[i]n situations in which multiple events, one of which is covered, occur sequentially in a chain of causation to produce a loss, [which results in] the loss [being] covered if a covered cause starts or ends the sequence of events leading to the loss." Flomerfelt, 202 N.J. at 447. Appleman's Rule provides:

> Where a peril specifically insured against sets other
> causes in motion which, in an unbroken sequence and

connection between the act and final loss, produced the result for which recovery is sought, the insured peril is regarded as the proximate cause of the entire loss. It is not necessarily the last act in a chain of events which is, therefore, regarded as the proximate cause, but the efficient or predominant cause which sets into motion the chain of events producing the loss. An incidental peril outside the policy, contributing to the risk insured against, will not defeat recovery . . . . In other words, it has been held that recovery may be allowed where the insured risk was the last step in the chain of causation set in motion by an uninsured peril, or where the insured risk itself set into operation a chain of causation in which the last step may have been an excepted risk.

[Stone, 211 N.J. Super. at 251 (quoting 5 John A. Appleman, Insurance Law and Practice § 3083 at 309-311 (1970)).]

Thus, our Supreme Court has recognized Appleman's Rule in first-party coverage decisions. Flomerfelt, 202 N.J. at 447. In addition, we have discussed or applied Appleman's Rule in the context of different types of insurance policies concerning both first-party and third-party claims. See Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc., 181 N.J. 245, 257-59 (2004) (adopting Appleman's proximate cause rule in the context of claim by auto dealership under its "commercial package" insurance policy); Stone, 211 N.J. Super. at 252 (applying Appleman's Rule); Franklin Packaging Co. v. Cal. Union Ins. Co., 171 N.J. Super. 188, 191 (App. Div. 1979) (applying Appleman's Rule; coverage attaches because first event in causative chain is covered); Simonetti, 372 N.J.

Super. at 431-32 (discussing Appleman's Rule in context of claim under homeowners insurance policy for mold damage allegedly caused by water from rainstorm); Search EDP, Inc. v. Am. Home Assurance Co., 267 N.J. Super. 537, 543-44 (App. Div. 1993) (applying Appleman's Rule to a chain of causation that entitled plaintiffs to a defense).

Defendant contends that in order to avoid Appleman's Rule, carriers often add language to policy exclusions to "eliminate from coverage any and all events in the chain of causation leading up to an excluded event." This language, commonly referred to as an anti-concurrent causation (ACC) clause, was contained in Zurich's first two policies issued to VHCA in 2005 and in 2006. The ACC clause barred claims for otherwise covered concurrent or sequential clauses of loss in the chain of causation. The ACC clause stated,

> It is agreed that this exclusion applies regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to that injury or damage.

Because of this limiting language, Chenault asserts he did not seek recovery from the 2005 and 2006 Zurich policies. The later policies, 2007 to 2010, however, did not contain this language. Thus, Chenault argues that the elimination of the ACC clause in the later policies broadens coverage for insured

21

events in the chain of causation leading to the mold damage and does not restrict the application of Appleman's rule. This argument is unpersuasive.

We recognize that the language under the relevant Zurich policies changed. However, the language under Coverage B in the 2007 to 2010 Zurich policies preclude coverage "to any liability, damage, loss, cost or expense: . . . caused directly or indirectly by the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any: . . . fungi, or bacteria." The policy includes in its definition of fungi, "mold or mildew and any mycotoxins."

While the motion judge in his decision stated that the "mold exclusion bars coverage because the efficient proximate cause doctrine does not apply as a matter of law[,]" the judge also recognized "[t]he plain language of the mold exclusion forecloses the application of the Appleman's rule." The motion judge found the language of the mold exclusion was "clear [and] unambiguous and plainly bars coverage for liability damage loss caused directly or indirectly by mold." Here, Chenault alleged his injuries were caused directly by mold, and therefore, the mold exclusion applies, barring coverage.

Because the language of Zurich's policies is clear and unambiguous, we need not reach the issue of whether Appleman's Rule is applicable under any

22

circumstances in the context of a General Commercial Liability (GCL) policy. Rather, the language of the policies is paramount in determining whether coverage exists, or an exclusion applies. Based on our de novo review, we enforce the clear, explicit contract language of the mold exclusion, as did the motion judge. We are satisfied the motion judge did not err in granting summary judgment because unambiguous language of the mold exclusion provisions in the 2007 to 2010 policies exclude mold-related injuries, regardless of the origin of the mold, through the causation language, namely injuries caused "directly or indirectly" by mold. Moreover, under the terms of the Zurich exclusion provisions, it is irrelevant how the mold came to exist; rather, it matters only whether the mold is the direct or indirect cause of the alleged damages.

III.

A. Consumption Exception to Mold Exclusion.

Following the motion judge's order granting partial summary judgment and finding Appleman's rule inapplicable, the issue to be resolved at trial was whether the consumption exception restored coverage for mold on food intended for consumption by Chenault. The mold exclusion contained in the 2007 to 2010 Zurich policies included an exception which provided: "[t]his exclusion does not

apply to any fungi or bacteria that are, are on, or are contained in, an edible good or edible product intended for human or animal consumption."

Chenault contends the trial court erred by "misinterpret[ing] the exception to the mold exclusion by misapplying well-established rules of policy interpretation." Chenault argues that to trigger the consumption exception, he was only required to establish there was mold on edible goods "intended" for consumption. Chenault asserts the trial judge erred by adding restrictive language, which the policy did not contain. He summarized the trial judge's conclusion that the exception does not apply absent proof: (1) "Chenault actually ingested mold-contaminated food; (2) the food he ingested contained harmful species of mold that included the mycotoxin Trichothecene; and (3) he consumed the contaminated food in sufficient quantities to cause his bodily injury." In sum, Chenault claims this "new exception" determines the outcome of this case: "if the exception applies, the mold exclusion does not apply."

The trial judge properly noted that Chenault did not allege in his pleadings or in the underlying litigation that he was injured by ingesting mold-infested food and the evidence at trial was insufficient to prove this claim. Thus, the trial judge concluded that coverage was not restored. We discern no error in the trial

judge's findings of fact or conclusions of law, rejecting Chenault's claim that coverage should be restored without proof of a consumption-caused injury.

In determining whether the consumption exception in the Zurich policies restored coverage to Chenault, we begin with the language of the contract. The contract provisions are "to [be] read . . . as a whole in a fair and common sense manner." Cypress Point Condo., 226 N.J. at 415 (quoting Hardy ex rel. Dowdell v. Adbul-Matin, 198 N.J. 95, 103 (2009)). The mold exclusion bars coverage for "liability, damage, loss, cost or expense . . . caused directly or indirectly by the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any . . . Fungi or bacteria . . . ." The exception states: "[t]his exclusion does not apply to any fungi or bacteria that are, are on, or are contained in, an edible good or edible product intended for human or animal consumption."

Considering these provisions together, as the trial judge did, the liability, damage, loss, cost or expense must be caused by "fungi or bacteria that are, are on, or are contained in, an edible good or edible product intended for human or animal consumption." The exception adds back coverage in limited circumstances where damage or loss is a result of ingestion of fungi or bacteria on an edible good intended for human consumption. As the trial judge properly

A-3321-22

found, to conclude Chenault needed only to prove there was mold on his food, and not that he was injured by the consumption of mold on his food, would cause the exception to swallow the exclusion. See GTE Corp. v. Allendale Mut. Ins. Co., 372 F.3d 598, 614 (3d Cir. 2004).

Both the parties and the trial judge cited to authority from other jurisdictions, which have addressed the mold exclusion. Chenault argues that courts from other jurisdictions considering similar exclusions did not require proof plaintiff had consumed the mold-contaminated water. See e.g., Acuity v. Reed & Assocs. of TN, LLC, 124 F. Supp. 3d 787, 795 (W.D. Tenn. 2015); Nationwide Mut. Fire Ins. Co. v. Dillard House Inc., 651 F. Supp. 2d 1367, 1370 (N.D. Ga. 2009) (where plaintiff alleged husband died of Legionnaires' disease, contracted by bathing in a hot tub). However, as the trial judge aptly noted, unlike Chenault, in these cases the plaintiffs "alleged mold related injuries had resulted from use of the mold contaminated water." Therefore, the courts did not need to address the issue of whether injury had occurred as a result of mold-contamination on edible goods.

Having concluded that Chenault was required to prove he was injured through consumption of mold on his food, the trial judge turned next to assessing the credibility of the expert witnesses. The trial judge rendered detailed

credibility findings, accepting the testimony of Zurich's expert, Dr. Robert Laumbach, an expert in the fields of epidemiology, toxicology, environmental and occupational medicine, and industrial hygiene, as credible, and rejecting Chenault's expert, Dr. Lawrence Guzzardi, an expert in the field of medical toxicology, as lacking credibility because his opinion lacked scientific reliability.

For instance, Dr. Guzzardi concluded that because mold, mold spores, mold fragments were "present in the air," these fragments "inevitably [were] deposited on food and beverages in the condominium." Also, those mold spores and fragments would have been "deposited on kitchen surfaces and on food present on kitchen surfaces and in an opened refrigerator." Therefore, Dr. Guzzardi concluded,

> [I]t is my opinion that the mold that was present in Mr. Chenault's condominium, and specifically, the mold, mold spores and mold fragments in the air and on the surfaces of the condominium, also were present on the food and beverages in his condominium and contaminated those foods and beverages, including those that he consumed during the more than [eighteen] years that he lived in his condominium residence, from 2001 through March, 2009.

27

As pointed out by the trial judge, Dr. Guzzardi acknowledged that none of the experts in the case opined Chenault suffered an injury by ingesting mold-contaminated food.

The record further supports the trial judge's finding that Dr. Guzzardi could not identify a "single study addressing whether indoor-growing mold contaminates food and causes injury." Dr. Guzzardi agreed that the urine analysis completed on Chenault in 2013 to detect the present levels of dangerous mycotoxins was an appropriate means for measuring these levels in a human and critical to his analysis. However, when questioned regarding statements from the Food and Drug Administration (FDA) and Center for Disease Control (CDC) that urine mycotoxin tests are not approved by the FDA for accuracy or clinical use, he somewhat agreed with these authorities. Again, as noted by the trial judge, Dr. Laumbach testified that the FDA and CDC have not approved urine testing for clinical use. Dr. Guzzardi was also unable to cite to any peer-reviewed, scientific studies confirming that toxins can remain in the body for years. Also, as the trial judge noted, Dr. Guzzardi "did not know at what dose Chenault consumed mycotoxins at any point in time. Nor did he know with what frequency [Chenault] consumed food contaminated with mycotoxins."

28

Dr. Laumbach, on the other hand, detailed the scientific method, or exposure pathway analysis, he used to discern the necessary requirements for airborne mycotoxins to contaminate food and cause injury. He opined that it was implausible that toxins germinated in Chenault's food and produced a sufficient amount of mycotoxins to cause injury at any point during the time he resided in the condominium. After explaining his analysis and reasoning, Dr. Laumbach testified there was no evidence that mycotoxins contaminated Chenault's food.

As the fact finder, the court is permitted to accept or reject the testimony of an expert witness. Kozma v. Starbucks Coffee Co., 412 N.J. Super. 319, 325 (App. Div. 2010). Giving particular deference to the trial judge's assessment of witness credibility, we reject Chenault's argument that the trial judge misinterpreted the exception to the mold exclusion by finding that proof of bodily injury through consumption of edible goods or products intended for human consumption is required. The trial judge's findings were based upon substantial credible evidence in the record.

B. First Manifestation of Illness.

Finally, Chenault contends the trial judge erroneously applied a "first manifestation" trigger to coverage for his continuous injuries and damage.

Chenault testified he began experiencing symptoms in the early 1990s, well before the Zurich coverage commenced. The first diagnosis of mold-related injuries occurred in March 2009. Chenault avers that because he did not know his injuries and symptoms were caused by mold, and no doctor had advised him of such until 2009, the manifestation date for determining the occurrence of a bodily injury should be analyzed under the continuous trigger doctrine.

The trial judge rejected this argument and the continuous trigger theory, finding that the manifestation of Chenault's injuries occurred before the Zurich policies commenced. Because we are satisfied the trial judge correctly granted partial summary judgment, holding that the mold exclusion applied to bar coverage, and after trial, correctly determined that the mold-consumption exception to the mold exclusion did not restore coverage, we need not address this remaining issue.

C. Reasonableness of Settlement in Underlying Litigation.

Although Zurich did not file a cross appeal challenging the reasonableness of the settlement agreement, it raises this issue in its responsive brief. Because Zurich did not file a cross-appeal, we decline to address this issue; it is not properly before us. R. 2:3-4; R. 2:4-2; Burbridge v. Paschal, 239 N.J. Super. 139, 152 (App. Div. 1990) ("[A] party, in order to attack the actions below which

were adverse to him, must pursue a cross-appeal.").  It is also unnecessary to address the issue in light of our resolution of Chenault's appeal.

IV.

In sum, we affirm the order of October 17, 2019, granting reconsideration of Zurich's summary judgment motion, thereby denying coverage based on the clear language of the mold exclusion contained in the relevant Zurich policies. We also affirm the trial order of May 24, 2023, in relevant part, denying restoration of coverage under the consumption exception to the mold exclusion.

To the extent we have not specifically addressed any of Chenault's arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3321-22